In re Estate of Leonard A. Busby, Deceased.
Esther C. B. Busby et al., Appellants, v. The First
National Bank of Chicago, Appellee.

Gen. No. 37,758.

Opinion filed February 9, 1937.

SWIGER, SCANDRETT, CHAMBERS & LANDON, of New York, and POPPENHUSEN, JOHNSTON, THOMPSON & COLE, of Chicago, for appellants; EDWARD R. JOHNSTON, ANAN RAYMOND, KARL M. GIBBON, HENRY G. O'DONNELL, all of Chicago, and J. ANTHONY PANUCH, of New York, of counsel.

WINSTON, STRAWN & SHAW, of Chicago, for appellee; SILAS H. STRAWN, JOHN D. BLACK, WALTER H. JACOBS and GEORGE B. CHRISTENSEN, all of Chicago, of counsel.

MR. PRESIDING JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

Leonard A. Busby died September 9, 1930, leaving surviving him his widow, Esther C. B. Busby, and two minor children, Janet Busby and John Kemp Busby. By his will dated August 18, 1930, decedent nominated the First Union Trust and Savings Bank (hereinafter for convenience referred to as the bank) as executor

and trustee of his estate. The will directed the payment of debts and certain specific legacies aggregating $23,000 to his three sisters and other relatives, and created a trust of the residuary estate for the benefit of his widow and two minor children. Except for certain miscellaneous personal property and effects the precise condition of decedent's estate at the time of his death was as shown by the following tabulation:

| Name of Brokers and Banks | Market Value of Pledged Securities | Amount of Decedent's Indebtedness | Market Value of Equity |
|---|---|---|---|
| Thomson & McKinnon, | $ 510,351.74 | $324,832.89 | $185,518.85 |
| Babcock, Rushton & Co. | 467,889.79 | 336,221.17 | 131,668.62 |
| National Bank of the Republic | 295,062.50 | 182,507.00 | 112,555.50 |
| Northern Trust Co. | 119,867.50 | 75,000.00 | 44,867.50 |
| First National Bank of Chicago | 45,875.00 | 27,872.15 | 18,002.85 |
| Iron Mountain Bank, Ironton, Mo. | 9,170.00 | | 9,170.00 |
| | $1,448,216.53 | $946,433.21 | $501,783.32 |
| Cash | | 14,195.60 | |
| Accrued Income | | 13,000.00 | |
| Policy of Life Insurance | | 10,000.00 | |
| Unpledged Securities | | 149,932.73 | 187,128.33 |
| | | | $688,811.65 |

September 10, 1932, the executor filed in the probate court of Cook county its current account and report of administration of the estate to August 4, 1932, which the court thereafter ordered to stand as its final account and report to that date. After reciting that none of the legacies and only certain claims against the estate had been paid, the account and report showed the estate to be hopelessly insolvent. Objections to the approval of the account and report of the executor were filed by the widow, the daughter (having attained her majority) and the minor son by his *guardian ad litem,*

charging gross negligence by the executor in the administration of the estate and praying that its account be surcharged with the amount of loss sustained by the objectors and the executor removed. After hearing, an order was entered by the probate court approving the account and report and denying the prayer of the objectors for the removal of the executor and the surcharge of its account. From this order a joint appeal to the circuit court was prayed and perfected by the residuary legatees. Following a hearing there an order was entered by the circuit court June 5, 1934, finding that the executor was not guilty of negligence in the administration of the estate, overruling the objections to the account and report and approving same. It is this order that the objectors seek to reverse with a remanding order directing the surcharge of the account of the executor and for an accounting as prayed in their objections.

The record is voluminous and contains much testimony and many exhibits consisting of various charts, graphs, tabulations and compilations depicting the condition of the estate, as well as the state of the market on the various stock exchanges, during the period covered by the executor's account. We have examined carefully and considered all the evidence in this case and believe that a proper understanding of the issues involved necessitates a rather comprehensive and detailed statement of the facts.

Decedent was a lawyer and prominent in the business affairs of Chicago. His death was unexpected, resulting from a brief illness following a minor operation. He and Melvin A. Traylor, president of the executor bank, were intimate friends and their families were in close social contact. They had some common business interests. The executor had no advance knowledge that it was to be so named. When the bank was apprised of the contents of decedent's will and

of its appointment as executor thereof September 10, 1930, Mr. Traylor assumed direct charge of the estate and shortly thereafter delegated John C. Mechem, vice president of the First Union Trust and Savings Bank, to handle the estate under his supervision. Mr. Traylor advised his associate officers and subordinates that the estate was to be given the same care and attention as if it were his own brother's. Authority over the estate was vested in the executor by item seventh of the testament, which reads:

"I hereby give my said Executor full power and authority to sell without order of court, any property, whether real or personal, belonging to my estate, at either public or private sale, for cash or part cash and part credit, and upon such terms as to it may seem advisable for the purpose of carrying out any provisions of this my will. I also give my said Executor full power and authority to settle and compound any claims either in favor of or against my estate, as to my said Executor shall seem best, and, for the purposes aforesaid, to execute and deliver all proper and necessary conveyances and to give full receipts and discharges.

"I further authorize and direct my said Executor to pay out of the corpus of my estate all inheritance, estate, or other taxes or governmental charges which under any law of the United States or of any state may be imposed upon my estate or as a condition to the transfer of the gifts, devises, and bequests or any of them hereunder. I hereby request my said Executor and the Trustee to consult with the said Harry P. Weber on all matters pertaining to the administration of my estate and the execution of the trusts hereunder."

The statement of its assets, as heretofore tabulated, shows that the estate consisted largely of securities, practically all of which were listed on the principal

stock exchanges of the country. Their gross market value on the date of Mr. Busby's death was about $1,600,000. Securities then worth approximately $1,450,000 were pledged with banks and brokers to secure the indebtedness of the deceased to such banks and brokers, amounting to $946,433.21. The value of the free and unpledged securities was $149,932.73, and $37,195.60 in cash and readily collectible accounts made up the balance of the estate. In addition to the indebtedness owing to the banks and brokers by decedent, other obligations of a then unknown amount were also chargeable against the estate, besides the funeral bill and costs of administration.

The executor bank was an affiliate of the First National Bank of Chicago. All its capital stock was owned by the latter and Melvin A. Traylor was president of both institutions. The banks have since merged under the name of the First National Bank of Chicago, which is now acting as executor herein. Mr. Traylor continued to act as its president until the time of his death, subsequent to the approval of the executor's account by the probate court. The will was probated and letters testamentary were issued by the probate court October 10, 1930, on which date the bank qualified as executor. September 10, 1930, the bank acting as executor *de son tort* directed the sale of some Insull Utility Investments Company "rights" held by the estate, which had to be exercised or sold by September 15, 1930. These "rights" were sold September 12, 1930, for about $4,000. Robert G. Collins, in charge of the investment statistical department of the bank, knew the securities in the estate and their market value, as well as the nature and extent of the estate lien indebtedness on September 12, 1930, and on that date began to assemble statistical data of each company whose securities were included in the assets of

the estate with respect to its cash and reserve position, its earnings and dividend history, the extent of its obligations, the market history of the securities, etc., completing his exhaustive analysis September 15, 1930, when Mr. Traylor was informed of the condition of the estate, or as he expressed it he was given a fact and figure "picture" of same. On the same date Collins reduced the "picture" to a written statement containing his recommendations with respect to the liquidation of the securities, which he divided into two separate lists, one containing those which he considered the more speculative and which he deemed there was an urgent need to sell in order to discharge the large lien indebtedness, and the other those which he considered the less speculative and should be presently held. The securities placed by him on the "sell" list included 25 bonds and 33,000 shares of stock of about 27 different issues, having a market value of $919,250 September 15, 1930. Those placed by him on the "hold" list contained the balance of the stocks and some bonds, having a market value on said date of approximately $632,517.

As part of its organization the executor bank had established two investment committees, senior and junior. The junior investment committee was composed of junior officers, who "did the investigating" of securities and reported to the senior investment committee, which, in turn, "considered these recommendations and made decisions with respect to investment policies." According to the testimony of Mr. Traylor (his testimony in the probate court hearing was read into the record in the trial in the circuit court) "the gentlemen who were on the senior committee were men in age from forty-five to fifty-five and had had their entire business experience in the organizations of either the First National or the First Union

Trust. . . . They were selected with a special view of their fitness for the job,'' and ''this was the investment committee who had the final decision with respect to trust management and investment policies particularly,'' subject only to his final decision as president of the bank in case of doubt or controversy. There was available to the investment committee all the information compiled by the investment and statistical staffs of both banks bearing on securities, finances and market conditions and trends. The senior investment committee met September 16, 1930, and considered the condition of the Busby estate and Collins's recommendations for the sale and retention of the securities as listed by him. By the time this meeting was held the market value of the securities in the estate had declined from $1,598,149.26 to approximately $1,550,000. The minutes of said meeting disclosed the following action by the committee:

''A preliminary estimate of the gross value of this estate shows a figure of about $1,550,000, against which there is indebtedness in the form of loans and balances due against brokerage accounts in the aggregate of a little over $900,000. It is the Committee's wish that the brokerage accounts be closed immediately and the loans liquidated at the earliest possible moment. To this end it makes tentative approval of the sale of the following securities which are the more speculative issues of the account.'' (Then followed a list of the securities tentatively approved for sale ''at'' prices indicated thereon.)

The securities and their prices appearing on the list contained in the committee's minutes were the same securities and prices shown on Collins's ''sell'' list and represented the market prices of such securities on September 15, 1930. The minutes of said meeting concluded with the following:

"Under the will, we are to consult with Mr. Weber of Mr. Busby's firm and such suggestions as he has to make will have the Committee's consideration."

The next day Collins called on attorney Weber and told him that he had a list of the securities that the investment committee of the bank had tentatively decided to sell. He testified that Weber "did not look at the list but told him that it was his advice that we take no action at that time." The minutes of the meeting of the senior investment committee of September 19, 1930, read:

"It is reported to the Committee that Mr. Weber does not wish us to take any action with reference to closing the brokerage accounts in the estate, except in cases of emergency, until our appointment as executor has been received. This was reported to Mr. Traylor who concurred, but asked that a close watch be kept on the market of the securities in the accounts."

The market had been sinking steadily since the decedent's death and an average decline of a point a day on the shares of stock in the estate, which approximated 48,000 in number, meant a loss of $48,000 a day. September 20, 1930, Collins accompanied by Mechem, who had been placed in "immediate charge" of the estate by Mr. Traylor, again called on Weber. On this occasion Mechem stated to Weber that "we feel that we should begin liquidating the securities." According to Mechem, Weber stated that he was not a "security man" and that "that was a matter we would have to decide," but that, inasmuch as the executor did not know whether or not Mrs. Busby would renounce the will, it was his advice that the bank take no action until its formal appointment as executor. Mechem testified further that Weber then said that he thought "it would probably be all right" for the bank "to go ahead" and liquidate the securities with the widow's approval,

September 19, 1930, the day before the conference just mentioned, Mrs. Busby returned from New York where she had gone September 16, 1930, to place her children in school. Not having heard from the bank since her husband's death and being pressed financially, Mrs. Busby telephoned Mr. Traylor on September 23, 1930, for an appointment and he saw her that day. He discussed the condition of the estate generally, telling her that decedent was in the market in "a very dangerous way" and expressed surprise that "Leonard had been speculating so heavily." He pointed out to her that if the decline in the market continued at an average rate of a point a day the equity of the estate in the pledged stocks could be wiped out in 10 or 12 days. Mrs. Busby testified that when she asked Mr. Traylor what he thought might happen to the market he said "that was any man's guess, but that in his opinion it would be worse, a great deal worse, before it is any better"; and that when she asked him what had been done and what could be done to get the estate out of the market, he told her that the will would not be admitted to probate until October 10, 1930, but that "the bank had arranged to absolutely protect the estate." He then took her to Mechem's office and introduced him to her, saying that he would look after the estate. She testified further that Mechem told her that practically all the securities comprising the estate were pledged with brokers and banks, that there was approximately $1,600,000 in securities as against $950,000 in debts, and that, after payment of all debts, taxes and administrative expenses, there would be an estate of $500,000, which conservatively invested should yield an income of about $25,000 a year for her and her children.

Mechem testified that he told Mrs. Busby on this occasion that the bank wanted to start liquidating the securities to pay the debts; that until the bank was formally appointed executor it "had no technical right to sell and that we would not want to sell prior to our appointment without her consent"; and that after such formal appointment, while the bank would "be delighted to confer with her about the securities . . . and ask her opinion . . . , we would be obliged to act on our own judgment." Mechem had in his possession Collins's memorandum heretofore referred to containing his recommendations to the investment committee with respect to the sale of a large portion of the securities. He testified that he discussed the stocks on the list in a general way with Mrs. Busby and some changes were made as to same at her suggestion; that it was agreed that she would return two days later, September 25, 1930; that in the meantime she was to give the matter of suggested changes in the list her further consideration. Mrs. Busby stated that Mechem concluded the interview by telling her that she was not to worry, "to let the trust company do the worrying, let him do it, that was what they were there for." Mechem did not give her the list of the securities or a copy of same.

Pursuant to Mechem's instruction Collins prepared a typewritten memorandum dividing the securities in the estate into two classifications designated "A" and "B," which is as follows:

"9/23/30.

"TO: Mr. Mechem
FROM: Mr. Collins.

"We are listing below under List 'A' the securities which you and Mrs. Busby in your conference this morning decided should be sold.

"In List 'B' we show the securities which you decided to retain.

"In each case, we have shown the number of shares held, the market value as of today, September 23rd, 1930, and the total value of the securities in each group.

LIST 'A'

. . . . .

LIST 'B'

. . . . .

"You will note that the total market value of the securities which are to be sold is $833,514.42 and that the market value of the securities which are to be held is $614,709.50. In the plan originally submitted to the Investment Committee, the total value of the stocks which were to be sold was $919,250, while the market value of the securities held was $632,517. $900,000 must be raised to liquidate the indebtedness of the Estate.''

The "A" list contained practically all the securities earmarked for sale in Collins's memorandum of September 15, 1930, and in the minutes of the investment committee of September 16, 1930. The "B" list contained with slight variations the securities earmarked for retention by Collins and the investment committee. The total market value on September 23, 1930, of the stocks in the "A" and "B" lists will be noted from the foregoing memorandum, and it will also be noted that there was a substantial shrinkage in such market value as compared with the market value of all the securities in the estate on September 15, 1930, when Collins submitted his original plan to the senior investment committee for the liquidation of the securities.

When Mrs. Busby met Mechem again September 25, 1930, there was some discussion as to the securities in the "A" and "B" lists. Mechem testified that Mrs. Busby wanted to have 2,000 shares of Middle West Utilities that were on the "A" list retained and that he transferred these shares to the "B" list, at the same

time taking 1,500 shares of other stocks from the "B" list and placing them on the "A" list. Mrs. Busby denied that she made any suggestion of any kind with respect to the sale or retention of any of the securities at this meeting or at the prior meeting. At the conclusion of this meeting Mechem wrote at the foot of the memorandum of September 23, 1930, *"I approve of the immediate sale at the market of the securities in list 'A,'"* and requested Mrs. Busby to attach her signature to such approval. After reading same she did so.

Mr. Traylor testified that prior to securing Mrs. Busby's approval he realized that there was a necessity for the sale of the securities in the estate and for an early sale, but that sales were not made because he "did not have her signature." No sales were made prior to September 25, 1930, except of the "rights" heretofore referred to on September 12, 1930, and of some National Bank of the Republic "rights" on September 24, 1930.

Following are the minutes of the meeting of the investment committee of the bank on September 26, 1930:

"Progress with reference to the liquidation of brokerage accounts in this estate was reported to the Committee. Since the 13th of September the constant decline in the stock market appears to have cost the estate approximately $175,000. Walter Brewster of Russell, Brewster told Mr. Traylor that his firm would be glad to take Insull securities in any amount from the estate, at the market, and brokers were consulted as to the advisability of selling some of the stocks even in the present period of market weakness. It was their advice that this be done, which advice was confirmed by Clark, Dodge & Company, and, accordingly, orders were entered September 26th, which will liquidate at something more than $130,000 in the two accounts. If, after the most speculative items are sold, it appears

advisable to liquidate the accounts in a more orderly fashion they will be brought over to the Bank and a loan made in order to clear up the accounts. Mr. Traylor has approved of this last named suggestion made by Mr. Mechem.''

September 26, 1930, the bank commenced to sell securities which were up as collateral in the brokerage accounts with Babcock, Rushton & Company and Thomson & McKinnon, with the result that by September 29, 1930, about $140,000 was realized from the sale of stocks on the ''A'' list in those accounts and applied to reduce the estate's indebtedness to said brokers. None of the list ''A'' securities pledged as collateral with the National Bank of the Republic and the Northern Trust Company on their loans were sold at that time.

September 29, 1930, on instructions from Mr. Traylor, then in Cleveland, the First National Bank of Chicago, executor's affiliate, paid the balance then due Babcock, Rushton & Company and Thomson & McKinnon, amounting to $520,000, and took from said brokers assignments of their accounts against the estate, together with the remaining securities which they held as collateral. Simultaneously, the executor bank delivered to the First National Bank of Chicago its demand note for $520,000, bearing interest at 4½%, drawn to the order of the latter and executed by the former ''as executor *de son tort* of the will of Leonard A. Busby,'' pledging as collateral therefor the securities taken over by the First National Bank from the brokers. These securities had a market value on September 29, 1930, of $688,438.11, but were objected to by Mr. Brown, senior vice president of the First National Bank *''as improper margin collateral''* for the loan. Upon Mr. Brown's insistence all of the free securities belonging to the estate were then or later pledged to the First National Bank by the executor as additional security for its loan. September 30, 1930, the executor's invest-

ment committee approved "applying cash bank balances in the Busby Estate against loans" so that when the loan of the First National Bank was substituted for the lien indebtedness on the marginal accounts with the brokers, the entire estate was just an equity in pledged securities.

Mr. Traylor testified that the volume of trading in the stocks belonging to the estate was such that all could have been sold within forty-eight hours at the prevailing market price. Although Mechem wrote the form of Mrs. Busby's approval of the sale of the securities in list "A," which had a market value in excess of $837,000 on September 23, 1930, and admitted that the term "at the market" was intended to mean "the market at the time the security is sold," the executor's sales of the securities thereafter were in most instances neither "immediate" nor "at the market." Many of the orders for sale were entered at a price above the market and left there for weeks at a time until the market price fell to a price far below the offering price. Mr. Traylor testified that this was done because, after he secured Mrs. Busby's approval to sell on September 25, 1930, he decided to sell for what he believed was a "warranted price," irrespective of the prevailing market price. This policy was followed with respect to sales both before and after the bank's qualification as executor October 10, 1930, whether the securities were on list "A" or list "B" of the memorandum of September 23, 1930.

September 10, 1930, the day after decedent's death, the market prices of the securities in the estate were higher than on any day during the period covered by the account, but thereafter, as heretofore stated, the stock market was in a steady decline, which continued with some brief upturns, into the month of December, 1930. Improvement followed, which carried the stocks in a general rising market until toward the end of March, 1931. The trend of the market is graphically

illustrated by the following comparison of the approximate net value of the securities in the estate on the various days shown:

| | |
|---|---|
| "September 9, 1930, | $650,000 |
| September 23, 1930, | 562,000 |
| September 30, 1930, | 400,000 |
| October 9, 1930, | 360,000 |
| October 31, 1930, | 297,000 |
| November 8, 1930, | 200,000 |
| November 20, 1930, | 290,000 |
| November 29, 1930, | 263,000 |
| December 15, 1930, | 90,000 |
| December 31, 1930, | 135,000 |
| January 22, 1931, | 260,000 |
| January 31, 1931, | 238,000 |
| February 23, 1931, | 330,000 |
| February 28, 1931, | 340,000 |
| March 19, 1931, | 320,000 |
| March 31, 1931, | 277,000." |

(The equities represented on the foregoing dates do not take into consideration any obligations of the estate except the bank and broker indebtedness secured by liens on the securities which were held as collateral.)

Following the month of March and through the summer of 1931, the net value of the securities fell below $200,000. Toward the end of September, 1931, a precipitous decline wiped out all the equity, leaving the estate insolvent and it became hopelessly so in the following December. The following summary shows the amounts received for securities sold by the executor by months:

"List 'A.'

| 1930 | |
|---|---|
| September | $143,321.70 |
| October | 32,397.95 |
| November | 18,730.00 |
| December | 5,601.67 |

1931
January                     $ 54,763.91
February                     207,323.51
March                         90,034.36
April                           None
May                             None
June                            None
July                            None
August                          None
September                       None
October                         None
November                        None
December                     12,309.62
1932
January        .                  4.70
February                        None

List 'B.'

1930
September                       None
October                         None
November                        None
December                        None
1931
January                         None
February                    $   3,617.02
March                           None
April                           None
May                             None
June                            None
July                         29,551.00
August                          None
September                       None
October                         None
November                        None
December                     32,971.30
1932
January                      8,598.50
February                     7,141.24

Miscellaneous Securities
(not listed on 'A' or 'B')

| 1930 | |
|---|---|
| September | $ 5,085.98 |
| October | 1.60 |
| 1931 | |
| January | 697.94 |
| March | 13,310.00 |
| December | 612.26.'' |

Although claims to the extent of nearly $170,000 were filed against the estate, the claims allowed amounted to only $22,679.69, which included a claim of Mrs. Busby for $8,000 for the value of certain securities which Mr. Busby held in trust for her. With the exception of the funeral bill and some small items, neither the allowed claims nor the specific legacies were paid by the executor. The principal account credit balance of the estate as of September 23, 1930, as shown by the balance sheet in evidence, was $562,003.54. May 14, 1932, as shown by the executor's account, the loss on all of the securities sold was $297,960.89 and the depreciation in the market value of the securities retained and still owned by the estate was $411,786.01, as compared with their market value September 23, 1930.

The objectors contend that on the uncontradicted evidence the conduct of the executor with respect to the administration of the estate, resulting in its total destruction, constituted gross negligence, for which it is liable as a matter of law.

The position of the executor as stated in its brief is ''that the law requires an executor to exercise 'that degree of skill and diligence which an ordinarily prudent man bestows upon his own similar affairs. . . . and if his acts will stand the test of that rule, he cannot be held liable for any loss that may be sustained

by the estate,' (*Christy v. Christy,* 225 Ill. 547)''; and that, it having been amply proved by the evidence ''that the Executor discharged its duty by informing itself as to possible economic trends and selling from time to time, such securities as it believed commanded a market price commensurate with their intrinsic value,'' it ''is not subject to surcharge or criticism.''

Each case of this class is *sui generis* and it is the established rule that the special and distinctive facts of each proceeding of this nature must determine the liability or exoneration of the particular fiduciary. (*In re Parsons' Estate,* 257 N. Y. S. 339.) Courts have recognized the unusual burden cast upon fiduciaries by the unprecedented shrinkage in value of securities since October, 1929, just as similar recognition was accorded by courts to conditions which accompanied and followed prior industrial depressions. The current depression, however, has not given any immunity bath to imprudent and negligent executors. (*Estate of Stumpp,* 274 N. Y. S. 466.) While it has been generally held that a fiduciary should not be held liable for an honest mistake in judgment upon what was fairly matter of judgment, where the depression from which we are emerging has been the direct cause of a loss sustained by an estate, no moratorium, because of the depression, has been declared by the courts on the due performance of their fiduciary duty by executors.

The executor insists, citing *Christy v. Christy, supra,* that the test of its conduct is the exercise of ''that degree of skill and prudence which an ordinarily prudent man bestows on his own similar private affairs.'' The rule as enunciated by the Supreme Court in the *Christy* case as applicable to the facts therein and to comparable facts in other similar cases was not intended, in our opinion, to apply to a situation such as is presented by the facts and circumstances of this case. The fact that ordinarily prudent men in the conduct of their

own private affairs may speculate or even gamble with their own money or property surely cannot be used as a standard by which to measure a fiduciary's duty of care to his wards. In *In re Corrington,* 124 Ill. 363, the court said "it was the duty of an executor to use that degree of reasonable diligence ordinarily employed in like business affairs by men of common prudence." In passing upon the duty of trustees in *Merchants Loan & Trust Co. v. Northern Trust Co.,* 250 Ill. 86, the court held: "The law does not give trustees the same freedom of choice in investments that may be exercised by prudent business men in their own affairs." The executor in the instant case is a fiduciary which held itself out as being especially qualified to administer estates intrusted to its care and, we think, that under the law the risks it was permitted to take were limited to such risks only as an ordinarily prudent man would take who is a trustee of the money of others. (*In re Buhl's Estate,* 211 Mich. 124.) The executor is not chargeable with the gift of prescience or prophecy and its conduct must be judged wholly on the conditions, facts and circumstances with which it was confronted when and after the estate came to its hands. The executor's good faith in the instant case is not questioned, but there is the question as to whether its opinions were prudently formed and its judgment warranted by the circumstances. Did the executor act as an ordinarily prudent and cautious person who was the trustee of the money and property of others would have acted under similar circumstances? If it did not then its motives and virtues, although they may have been intended to subserve the best interests of the estate, cannot exonerate it from liability for the consequences. If, however, it did, then the mere fact that it was mistaken in the exercise of its honest judgment cannot be invoked or relied upon for the purpose of subjecting it to the resultant loss. (*In re Pettigrew,* 115 N. J. Eq. 401, 171 Atl. 152.)

The executor states in its brief that "it was seeking merely to conserve the estate at about the date of death level" and that "the best informed commercial and economic opinion at that time [September and October, 1930] was that, while the depression might not be over, the country had undergone a year of panic and deflation since 1929; that any further substantial recession in market prices was highly improbable; that conditions were bound to improve, certainly by the turn of the year; and that based upon the information assembled by the bank, many of the securities in Mr. Busby's estate were then selling below their intrinsic worth." It then urges that since Mr. Traylor was one of the outstanding business men and financiers of the nation, and since his judgment "that the market prices which it could have conserved were below the intrinsic worth of the securities". was in accord with the majority opinion of the time on the information then available, no charge of negligence can be predicated upon the executor's mistake in judgment in failing to liquidate the lien indebtedness by selling the securities promptly at their market price.

Mr. Traylor testified that he ordered the estate securities sold at the times and prices at which they were sold, and the balance retained because it was his best judgment that there would be an enhancement of prices on the stock market "from the best guess I could make on the best dope I could get." In other words it is claimed that under all the facts and circumstances, as they appeared to the executor from the time the estate came into its hands, so long as it used its best judgment as to a rise in the security market, it had the right to speculate with the pledged stocks comprising in the beginning the bulk of this estate and a short time later all of it.

No case has been cited and we have been unable to find one, in this or any other jurisdiction, where the duty and responsibility of an executor has been de-

termined under such extreme and unusual circumstances as are here involved. In support of its position the executor relies chiefly upon authorities of other jurisdictions, particularly New York, New Jersey, Pennsylvania and Connecticut, where, in so-called depression cases, the rule followed as to the duty of an executor was substantially the same as that announced in *In re McCafferty's will*, 264 N. Y. S. 38, where it was held at p. 68: ''On the one hand it was their duty to liquidate the assets of the estate. On the other they owed an equal obligation to conserve the values of those assets and not to sacrifice them at an inadequate price.'' The authorities referred to will be discussed later, when it will be shown that the factual situations involved therein are not even remotely comparable to the facts in the instant case.

This is not a case where the securities were owned outright or held on a conservative margin, or where the estate was in a strong position and able to carry them through an emergency. As has been heretofore stated, each case of this character must be decided on its own particular and distinctive facts. When the estate came into the hands of the executor, it consisted of a huge speculation except for about $37,000 in cash, or readily collectible accounts, and free and unpledged securities then worth about $150,000. The cash was gone and the free securities were no longer free within a short time. As has been shown there was no money with which to pay the creditors' liens and not only the chief asset but the only asset of the estate after September 29, 1930, when the First National Bank made the $520,000 loan to the executor and took over the estate's margin accounts with the brokers, was an equity in pledged stocks, ever at the mercy of the fixed lien indebtedness. The securities in the estate, consisting for the most part of common stocks, were speculative to begin with and the fact that they were held on a 33 1/3 per cent margin made them thrice speculative.

It is idle to urge that since some of the securities had a higher rating than others in certain financial publications, the executor was justified in considering them in the category of "investment" rather than "speculative" stocks. There might be some force to this contention if the stocks were owned outright or even held on a conservative margin. Held as they were and in the light of the then comparatively recent experience of the stock market crash of October, 1929, and the ensuing precipitous decline of the market right up to the time the executor took charge of this estate, with the resultant disastrous effect upon the prices of all the securities in the portfolio of the estate, the proposition cannot be seriously entertained that any of the estate securities were other than speculative. Not a single security pledged as collateral ever actually became an asset of the estate, since all of them continued to be incumbered with creditors' liens and even the securities which came to the estate free were swallowed up in the pledge to the executor's affiliate. Collins characterized the securities as speculative with a difference merely in degree, some being more and some less so. So likewise did Mechem and the investment committee. When the First National Bank lent the aforesaid $520,000 to the executor, its senior vice president Brown questioned the securities assigned to it having a then market value of $688,438.11 as *"improper margin collateral"* for its loan and insisted on the executor pledging the only free securities in the estate as additional collateral. Thus Brown went on record as to his opinion of their speculative character. Even Mr. Traylor recognized their perilous nature when he told Mrs. Busby on September 23, 1930, that if the market decline continued at an average of a point a day the estate could be entirely wiped out in ten or twelve days.

The executor knew that the stock market had been in a state of violent fluctuation on a downward trend

since the crash of October, 1929, and that a new decline had set in immediately after decedent's death. It knew, after it had pledged everything in the estate, that outside of a small insurance annuity the equity in the pledged stocks was all that decedent left for the support of his widow and children. The executor states in its brief that "it was learned that apart from the estate proper Mr. Busby left $140,000 in insurance payable to his widow and children on an annuity basis." This annuity amounted to $2,200 a year each for Mrs. Busby and her two children. The fact that they were to receive this annuity or the amount of it certainly granted no license to the executor to take the liberties with this estate which it did. The executor knew or should have known that the huge lien indebtedness could only be paid by the sale of the stocks pledged as collateral therefor. It knew, viewing the incumbered condition of the estate as early as September 15, 1930, that decedent had been engaged in heavy speculation and knew or should have known that as a professional fiduciary holding itself out to be exceptionally skilled and qualified in matters of estate administration, it had no right to continue decedent's speculation with the assets of the estate in the condition they were. No authority has been cited, and we venture to say none exists, which sanctions the operation of an estate incumbered as this one was by a fiduciary, corporate or otherwise, as though it were one large margin account, placing orders to sell the securities at prices above the market when it was declining and changing those prices to lower ones as the market went down.

Is there any satisfactory explanation offered for the loss of this estate? The executor bank claims that it employed consummate skill in the administration of the estate under the personal supervision of its president, Mr. Traylor, but that its best efforts proved

unavailing against the onslaught of the depression. The bank admits that its judgment viewed in retrospect was wrong, but claims that it cannot be held liable for its honest mistakes. The difficulty with the executor's position is that the facts do not sustain it. The contention of the objectors is not that the judgment of the bank viewed in retrospect turned out to be wrong or that the executor is liable for lacking the gift of prophecy, but that the bank disregarded the elementary and fundamental principles of executorship in that it failed to meet the test of "that degree of reasonable diligence ordinarily employed in like business affairs by men of common prudence" under the facts and surrounding circumstances as they existed in September, 1930, when the estate came into its hands. Mr. Traylor knew, according to his own testimony, that the lien debt "was something that had to be made out of the sale of these securities if it was to be paid" and the evidence is overwhelming that "the necessity for sales of securities in this estate and for the early sale" was fully appreciated by the bank. Prior to making the $520,000 loan from its affiliate, the bank reached the prudent conclusion to sell and sell promptly.

September 15, 1930, Collins prepared his recommendations to sell stocks having a then market value of $919,250. The proceeds of the sale of these stocks, plus the $37,000 available cash, would have been more than enough to liquidate the lien indebtedness of $946,433.21, leaving free and clear the less speculative securities of the then market value of $632,517. September 16, 1930, the investment committee of the bank approved Collins's recommendations and expressed the wish "that the brokerage accounts be closed immediately and the loans liquidated at the earliest possible moment." Mechem told Weber on September 20, 1930, that the bank desired to begin liquidating the

securities. Even Mr. Traylor on September 23, 1930, preliminary to securing Mrs. Busby's approval of the sale of the securities, in suggesting that she work out a program of liquidation with Mechem, told her that "time was of the essence under the circumstances." September 23, 1930, Mechem discussed the peril of the lien indebtedness and the necessity of liquidation with Mrs. Busby and thereafter on the same day with Collins, who prepared at Mechem's instance another written memorandum in which he again recommended the immediate sale of practically the same securities as were on his prior "sell" list and stressed the necessity of promptly discharging the lien indebtedness. September 25, 1930, pursuant to Weber's advice and at Mechem's request in behalf of the bank, Mrs. Busby's written consent was secured "to the immediate sale at the market" of securities that had a ready market and a readily realizable market value of $833,514.42. The investment committee's minutes of September 26, 1930, disclose that "Walter Brewster . . . told Mr. Traylor that his firm would be glad to take Insull securities in any amount from the estate at the market," that "brokers were consulted as to the advisability of selling some of the stocks even in the present period of market weakness" and that "it was their advice that this be done, which advice was confirmed by Clark, Dodge & Company."

Despite the opinion of everybody connected with the bank who had anything to do with the management of the estate, that it was imperative that securities be liquidated promptly in an amount at least sufficient to discharge the lien indebtedness, Mr. Traylor changed his mind and overrode the judgment of all of those who, according to his own testimony, were charged with handling the "trust business of the bank in the best possible manner so as to conserve trusts, and not to lose money, if possible." He disregarded the

recommendations of Collins, the investment statistician of the bank, the advice of brokers consulted by the investment committee, the opinion of Mechem and the decision of the investment committee that prompt liquidation was necessary. The "best dope" in his own bank in September, 1930, was unanimous for prompt liquidation and discharge of the lien indebtedness, yet Mr. Traylor ignored it.

The bank now seeks to explain the wiping out of the estate assets by asserting that "Mr. Traylor, president of the bank, had direct charge and final control of the estate" at all times and that he used his best judgment in its administration. We repeat that the question here is not one of judgment but of negligence. Did Mr. Traylor, acting as the directing officer of the executor, exercise the ordinary prudence which the condition of the estate and the surrounding circumstances required? It clearly appears from his own testimony that he did not. The bank attempts to bolster up its position that it cannot be held liable for an honest mistake in judgment in its administration of the estate by advancing other reasons why it should be absolved from liability. It is claimed that a large number of the securities which were in the decedent's name could not have been sold until the will was probated and the bank formally appointed executor October 10, 1930. It is sufficient answer to this contention to state that Collins testified that with the possible exception of the stock of one company, stocks could have been "borrowed" for sale in accordance with the common practice on the stock exchange until the stocks held in decedent's name were available upon the executor's formal appointment. The executor could also have had itself appointed as administrator, with the will annexed, and thus been enabled to sell such stocks as were held in decedent's name and were on the "A" list approved for sale by Mrs. Busby on

September 25, 1930. In any event the fact that some of the securities were in decedent's name cannot excuse the failure to sell them within a reasonable time after the letters issued October 10, 1930.

It is claimed also in the executor's brief that decedent willed the securities or his interest therein directly to the bank as ''trustee,'' and authorized the bank ''to retain them so that the benefits of the expected appreciation might be secured to his beneficiaries,'' and that his will ''contemplated that the executor would not sell beyond the amounts necessary for payment of expenses, taxes and specific legacies.'' This contention is without merit. Item seventh of the will, as heretofore set forth, contains the only powers granted the bank as executor, and no provision is found therein authorizing the executor to retain any securities owned by decedent on the date of his death. In passing upon a similar provision of the will involved in *Estate of Stumpp, supra,* the court held ''that this clause was intended to remove any doubt of the power of the executors to sell and that it did not vest authority in the executors to speculate with the estate assets nor change their obligation to sell speculative securities promptly.'' The bank took nothing under the will as trustee. As executor the bank was to turn over to itself as trustee the residuary estate and as such trustee it had the power to retain ''any . . . securities received by it from my [decedent's] estate.'' In this case there could be no residuary estate until the securities were sold and the debts, taxes and expenses of administration paid. Surely the bank did not believe back in 1930 that it had inherited the specific securities in the estate in its capacity as trustee and for that reason had the right to retain them. The bank's power as executor and trustee were as separate and distinct ''as if different persons had been appointed to each office.'' (*Wylie v. Bushnell,* 277 Ill.

484.) As what was intended by the decedent to be the residuary trust consisted entirely of personalty, it is elementary that the bank as trustee could take title only to the assets comprising the residuary trust estate from itself as executor. If the trust is the residue of personal property committed to the executor, it "can only become operative after the settlement of the estate is completed and the trustee receives the property from the executor." (*In re Estate of Mortenson*, 248 Ill. 520.)

As to the contention of the executor that it should be absolved from liability because in September and October, 1930, it was actuated by a desire to conserve the true value of the assets of the estate as of the date of death and it was unable to do so, because the market prices which it could have conserved were below the intrinsic worth of such assets, it is sufficient answer to state that it was under no obligation to increase the assets of the estate but was bound only in the exercise of reasonable care and prudence to liquidate the securities within a reasonable time in view of their condition.

Did the executor exercise reasonable diligence and prudence in making the $520,000 loan from the First National Bank? Its very purpose was to afford the bank a freer rein to speculate for a rise in the market. With its affiliate as its principal lien creditor, instead of the brokers, it was enabled to take longer chances on such market rise with less danger of being sold out. From the standpoint of the estate was this loan advantageous and did it reduce the hazard of the lien indebtedness? The lien indebtedness was merely transferred and in the process the only unpledged assets in the estate were thrown in for good measure as additional collateral for the loan. Whatever cash was in the estate at the time was also used in connection with the transfer of the loan. Thus the only

unincumbered assets left by the deceased, both cash and securities, which would in themselves have comprised a not inconsiderable estate, were sacrificed to Mr. Traylor's urge to carry on the speculation. Thin as the margin was on which the securities were held by the estate at the time of decedent's death and perilous as the hazard confronting the executor then was, the more the market declined the thinner the margin got and the more perilous the hazard became.

Mr. Traylor knew that the assets of her deceased husband's estate were all that stood between Mrs. Busby and her children and comparative privation. Yet he was willing to stake their all on a rise in the market. In our opinion his conduct in so doing was not only imprudent and negligent but positively reckless. He was dealing with the property of a widow and minor children, and it was hardly a matter of judgment as to whether or not he ought to take a chance on sacrificing the sole resources intended to provide for their future welfare and livelihood. While what an adult might do with his own securities, and the hopes he might indulge and the speculative hazard he might take in respect to his own property is, of course, no test of the duty of a fiduciary or admissible as a rule of conduct for an executor (*In re Stumpp's Estate, supra*) it is not a strained assumption that as a prudent, discreet person Mr. Traylor would not have risked his own all on his ''guess'' that there would be a rise in the stock market as he did that of the executor's almost impoverished wards. If we assume that the securities in Mr. Busby's estate, margined and incumbered as they were, belonged to Mr. Traylor and comprised his entire assets prior to his death, we have no hesitancy in stating that all reasonable minds will agree that if he staked and lost them all on the turn of the stock market leaving his own widow and children helpless and destitute, that his conduct in so

doing would have been highly imprudent and would have shown a total lack of care. *A fortiori* the executor in this case, a professional fiduciary, was, in our opinion grossly negligent in permitting the total destruction of the assets of the estate herein.

The conclusion is inescapable that it was the imperative duty of the executor to liquidate the securities in this estate as promptly as the circumstances permitted. It knew the exact condition of the estate by September 16, 1930, or within a week after the decedent's death. The stock market steadily declined. The executor explained that it did not sell any of the securities prior to September 26, 1930, because of fear that the widow might renounce the will. She was not even advised of her right to do so. Neither was she consulted nor advised as to the condition of the estate until September 23, 1930. When she was asked to approve the "immediate sale at the market" of securities then having a market value of over $800,000, she did not hesitate to do so. After her approval was had on September 25, 1930, the last obstacle to the prompt and orderly liquidation of a major portion of the securities was removed and the executor was chargeable with the duty of conserving the estate by reducing its perishable assets to cash. Securities in the relatively small amount of about $140,000 were then sold between September 26, 1930, and September 29, 1930, and on the latter date, as previously shown, the First National Bank made the $520,000 loan to the executor to pay the balance due on the brokers' accounts. From the date of said loan to January 1, 1931, the total sum realized from the sale of securities by the executor was inconsequential, amounting in all to about $56,000.

The executor's attempted justification of its failure to liquidate the lien indebtedness and realize a substantial proportion of the assets of the estate when it

could have done so, by claiming that it used its best judgment in the emergency, is feeble. Notwithstanding that the market was in an almost constant decline up to January 1, 1931, the executor was in a safety zone where an appreciable estate could have been saved by the diligent and prudent sale of the securities any time up to December 1, 1930. The equity in the estate assets sank as low as $90,000 on December 15, 1930, but the market showed a decided improvement in January, February and March, 1931, when nearly $370,000 was realized from securities sold. As late as March 31, 1931, an equity could have been realized of over $277,000 if all of the securities were sold, but they were not, as already stated. The executor was under no duty to increase the equity in the estate on any day or over any period covered by its account to $500,000 or to hold the securities until they again reached their date of death value. Its function was to conserve the assets by realizing their value as best it could within a reasonable time. The estate came to the executor's hands as nothing more than a hazard and its perilous nature was intensified by its continued failure and refusal to liquidate, and still further increased by its loan of the $520,000 from its affiliate to give it a freer rein to hold off for a hoped for rise in the market. The executor had an abundance of time to save the assets of the estate or at least the major portion of them, and it cannot now claim immunity for its error in an emergency which it challenged and defied. Acting imprudently in a dilemma it courted, in an emergency it invited, is not a legal explanation absolving it from responsibility for the loss of the estate.

The leading New York case cited by the executor, involving the question of the liability of executors for the loss sustained by an estate under their charge, by reason of their retention of speculative stock dur-

ing an economic depression, is *Matter of Weston,* 91 N. Y. 502, where the court refused to surcharge. The considerations which moved the court to exonerate the executors in the *Weston* case were reaffirmed in *Matter of Clark,* 257 N. Y. 132, 177 N. E. 397, and have been considered of controlling importance and cited as precedents in a long line of decisions handed down by the surrogate courts of New York during the current depression.

In the *Weston* case the testator, Weston, died May 7, 1873, leaving an estate of $566,000. Letters were issued June 7, 1873, to Horace Gray and George Cabot Ward, his executors under the will. Among the assets of the estate were 1,500 shares of stock of the St. Louis and Iron Mountain Railroad. A memorandum relating to this stock was found among decedent's papers describing it as "to be held firmly; a dividend expected in two years." The testator had bought the stock in 1871 at an average price of 59. In 1872 it was selling above par. In January of 1873, shortly before the company paid its first dividend, the stock was selling at 94. June 10, 1873, it had declined to 84 and the executors had an opportunity to dispose of it at 80. Ward, one of the executors, was a stock broker and an intimate friend of the testator. He owned 7,000 shares of the Iron Mountain stock. Both executors had confidence in the stock and consulted specialists who advised retention. Guided by these considerations and the testator's memorandum, they decided not to sell. In August of 1873, the failure of the firm of Jay Cooke & Co., followed by the crash of other financial houses, caused a panic which was followed by the depression of 1874 and 1875. The stock declined to 55 in 1873, rose to 67 in 1874, and then declined to 20. Ward held his 7,000 shares of the stock through the depression. Objections to the account of the executors conceded the good faith of the

executors and that in retaining the stock they acted with ordinary prudence, even though the result was disastrous. The real basis of the objections was that the duty to sell was mandatory under the testator's will. Although it refused to surcharge the executors under the particular facts therein, the court, in its opinion in the *Weston* case, used the following significant language at pp. 508, 509, 510 and 511:

"But the executors did not make this investment. They found the stock among the assets. Without their fault it came upon their hands, and they had to care for and dispose of it, with all its inherent risks on the one hand and possibilities on the other. That the testator thought well of it they had ample evidence. . . . His death occurred on the 7th of May, 1873, and a memorandum relating to this stock was found among his papers, describing it as 'to be held firmly; a dividend expected in two years.' The executors thus found themselves confronting an emergency, and with the path of duty before them somewhat blind and difficult. Why the testator should have made the memorandum except for the guidance and enlightenment of those who came after him, it is impossible to say; and while it did not bind them, it was advice they were justified in taking into account. . . . Letters testamentary were granted on the 6th of June, 1873, and the judgment and discretion of the executors was then called into play, for it was possible to sell the stock at once for about 80. Should they do so, or wait, was the important inquiry, to be answered with sole reference to the welfare of the estate committed to their care. They consulted and took the best advice obtainable and determined to wait. . . . The stock was paid for, and the estate strong and able to carry it through the unexpected emergency. . . . There is, and there can be, no rigid and arbitrary standard by which to measure the reasonable time within which

the discretion of an executor directed to convert an estate into money must operate. . . . The better opinion derived from them [authorities cited] would seem to be that each case must stand upon its own facts; that what would be a reasonable time in one instance might not be in another. . . . Stocks of variable value ought not to be timidly and hastily sacrificed, nor unwisely and imprudently held. Even where there is a direction to sell, reasonable time must be given, and what that is must be determined in each case by its own surroundings. Here the estate was large. A trust fund was early constituted which furnished enough of income for the immediate wants of the beneficiaries. They made no complaint at the time because the stock in question was held.''

It is important to note that not one of the considerations which moved the court to decline a surcharge in the *Weston* case obtained in the case at bar. Here there was no indication by the decedent's will or otherwise that he desired retention of the stocks which he held on a $33\frac{1}{3}$ per cent margin. The investment committee's recommendation to sell was disregarded by Mr. Traylor. The securities were *not* fully paid for. The estate was *not* strong and there were no assets in the estate outside of the equity in the pledged securities. No estoppel or acquiescence in the retention of the securities on the part of the widow and children is claimed and none could be established. The children were minors and under a disability to act. The widow urged Mr. Traylor to liquidate the lien debt and gave her consent to the immediate sale at the market of the securities set forth in list ''A'' of the memorandum of September 23, 1930.

The cases of *In re Frame's Estate,* 274 N. Y. S. 420, and *In re Junkersfeld's Estate,* 269 N. Y. S. 514, growing out of the current depression and cited by the executor, in which the surrogate court refused sur-

charge, have since been reversed by the New York appellate division of the first and second departments, respectively, in 284 N. Y. S. 153 and 279 N. Y. S. 481, and surcharge of the accounts of the executors therein ordered. The case of *In re Cross Estate,* 115 N. J. Eq. 611, 172 Atl. 212, cited by objectors has likewise been reversed in 176 Atl. 101. In the *Cross* case the prerogative court ordered surcharge, but the court of errors and appeals on appeal exonerated the executors from liability. The facts in these cases are so dissimilar to the facts in the case at bar that no useful purpose would be served by analyzing or discussing them.

The following are the other cases arising out of the current depression cited by the executor in which a surcharge was refused: *In re Andrews' Estate,* 265 N. Y. S. 386, 239 App. Div. 32; *In re McKee's Estate,* 265 N. Y. S. 47; *In re McCafferty's Will,* 264 N. Y. S. 38; *In re Booth's Estate,* 264 N. Y. S. 773; *In re Beadleston's Estate,* 262 N. Y. S. 507; *In re Disbrow's Estate,* 261 N. Y. S. 635; *In re Kent's Estate,* 261 N. Y. S. 698; *In re Sprong's Estate,* 259 N. Y. S. 77; *In re Winburn's Will,* 249 N. Y. S. 758; *In re Lazar's Estate,* 247 N. Y. S. 230; *In re Boulware's Will,* 258 N. Y. S. 522; *In re Chaves' Estate,* 27 N. Y. S. 641; *In re Pratt's Estate,* 257 N. Y. S. 226; *In re Parsons' Estate,* 257 N. Y. S. 339; *Peck v. Searle,* 117 Conn. 573, 169 Atl. 602; *People's Nat. Bank & Trust Co. v. Bichler,* 115 N. J. Eq. 617, 172 Atl. 207; *Harris v. Guarantee Trust Co.,* 115 N. J. Eq. 602, 172 Atl. 209; *In re Estate of Pettigrew,* 115 N. J. Eq. 401, 171 Atl. 152; *In re Jones' Estate,* 314 Pa. 93, 171 Atl. 265; *Citizens' Nat. Bank v. Brewer,* 253 Ky. 630, 69 S. W. (2d) 745; *In re Megargee's Estate,* 117 N. J. Eq. 347, 175 Atl. 808; *In re Balfe's Will,* 274 N. Y. S. 284; *In re Kent's Estate* (Cal. App.), 50 P. (2d) 457; *Stuber v. Snyder's Committee,* 261 Ky. 338, 87 S. W. (2d) 614; *In re Dickin-*

*son's Estate*, 318 Pa. 561, 179 Atl. 443; *In re De-Winter's Will*, 276 N. Y. S. 576.

Space will not permit us to distinguish each of the foregoing cases on its particular facts. However, in none of them are the facts comparable to the factual situation presented in this case. A careful analysis of these cases shows that one or more of the following considerations moved the court to decline to allow a surcharge therein: (1) The securities retained were high grade seasoned stocks of corporations with tremendous earning power; (2) the stocks were a favorite investment of the testator held over a long period of time; (3) the objectors were estopped either by their conduct or acquiescence from enforcing a surcharge; (4) in all, except the *McKee*, *Lazar* and *Peck* cases, the stocks retained were wholly owned, not being held on margin or pledged in any way that would place the equity therein at the mercy of the fluctuations of the stock market; (in the *McKee* case the estate was strong and only a relatively small portion of its securities was pledged, 4,000 out of 18,000 shares; in the *Lazar* case the securities were high grade stocks held on an 80 per cent margin; the pledge in the *Peck* case was made pursuant to order of court) ; (5) in none of the cases was the fiduciary confronted with the urgent necessity to realize cash promptly for the payment of debts; (6) in all of the foregoing cases the loss sustained was a mere "paper" loss. The estate still retained the stocks free and clear. In no instance was the entire estate destroyed, with the debts, administration expenses and specific legacies left unpaid. In all the cases retention of the depreciated securities was advised.

Not a single cited case presents the situation where a corporate fiduciary, acting through its chief executive, disregarded the recommendation of its investment committee to liquidate a lien indebtedness

promptly. Neither do any of the cited cases present the situation where a corporate fiduciary determined on a program of immediate liquidation in order to discharge the lien indebtedness of the estate, received the consent of the beneficiary thereto and then deliberately failed to carry out that program.

The acts complained of by the objectors were the acts of the executor and were in no way directed or acquiesced in by the widow or the two children. The children being minors were under a disability to act, and the widow by giving her signed consent to immediate liquidation, as specified in the written memorandum of September 23, 1930, did everything within her power to accelerate the immediate sale of the securities. According to Mr. Traylor, the entire responsibility for action or inaction in respect to sales of the securities was that of the executor, and the mere silence of the beneficiaries cannot be construed as acquiescence in the executor's conduct. (*White v. Sherman,* 168 Ill. 589.)

We are impelled to hold that however altruistic the motives and virtues of the executor may have been, or however much they were intended to subserve the best interests of the estate, the bank cannot avoid liability for its imprudent conduct in the management of the estate. Justice to the objecting beneficiaries requires the surcharge of the account of the executor in an amount sufficient to compensate them for their loss attributable to the bank's negligence. While the actual amount of the surcharge is not presently ascertainable, the rights of the beneficiaries may now be fixed and the principle of the liability of the executor established.

The first item of loss to be considered is the shrinkage in the market value of the securities because of the failure to liquidate them within a reasonable time. Where as here there is no conflict in the testimony as to the conduct of the executor, what constitutes a rea-

sonable time within which it should have sold the securities is purely a question of law. (*In re Parson, supra.*) The bank was absolutely free to sell the securities in an amount sufficient to discharge practically the entire lien indebtedness after Mrs. Busby's approval was secured September 25, 1930. That date should therefore mark the beginning of the reasonable period of liquidation. After its formal appointment as executor October 10, 1930, the only remaining obstacle to the sale of all the securities in the estate by the executor was removed. While it is true that all the securities could have been sold within 48 hours at their prevailing market price, and notwithstanding that the objectors strenuously insist that prompt compliance with its immediate duty to liquidate the securities required the bank to sell all of them by October 16, 1930, or at the latest by October 31, 1930, we are constrained to hold that a reasonable time for their orderly liquidation was within the six-month period beginning September 26, 1930, and ending March 26, 1931. Therefore, the average or mean equity that could have been obtained by the sale of the estate securities over said period will determine the amount of surcharge by reason of the shrinkage in the market value of the securities, and the amount of said surcharge shall bear interest at the legal rate from March 26, 1931, less such amounts as have been paid to the beneficiaries by way of income or laid out for expenses of administration.

The next item to be considered is the loan of $520,000 made by the bank as executor *de son tort* from its *alter ego,* the First National Bank. Was the pledge by the executor of the assets of the estate improvident and unauthorized and should the executor be subjected to a further surcharge in connection therewith? As has been heretofore shown this loan was improvidently made. If the securities had been prudently and expeditiously liquidated there would have been no occa-

sion or necessity for the loan. The bank acting as executor *de son tort* feared that it might be liable if it sold any of the estate securities, but in that capacity it did not hesitate to pledge a large proportion of such securities to its then affiliate bank to secure said loan. We think its action in so doing was clearly unauthorized. The repledge of the securities to the First National Bank did not lessen the hazard of the fixed lien indebtedness but increased it. It aggravated the burden of the estate by imposing on it the obligation of paying 4½ per cent interest on the $520,000. Its pledge of all the free assets of the estate as additional collateral for the further protection of its affiliate served to defeat the rights of the unsecured creditors, the aged and needy relatives of the decedent, who were specific legatees, and the widow and children beneficiaries. Therefore as a further surcharge the executor shall not be allowed any credit in its account for interest payments made on the loan to the First National Bank.

As heretofore shown by the tabulated statement of the condition of decedent's estate at the time of his death, he was indebted to the Northern Trust Company for a loan of $75,000, secured by collateral of the market value of $115,827.50 on September 23, 1930. This loan was reduced, by the sale of some of the securities pledged therefor and by certain cash payments, to a balance of $38,807.06 on May 16, 1931, when it was paid by the First National Bank, to which was assigned the decedent's note and the remaining supporting collateral of the market value of $26,000 on May 14, 1932. The tabulated statement heretofore referred to also showed that decedent's lien indebtedness to the National Bank of the Republic was $182,507, secured by collateral of the market value of $280,700 on September 23, 1930. This loan was likewise reduced by the sale of some of the securities pledged therefor and

cash payments to a balance of $113,414.89 on June 3, 1931, when it was paid by the First National Bank, to which was assigned the decedent's note and the remaining supporting collateral having a market value of $7,812.50 May 14, 1932. It will be noted that the supporting collateral for both of these loans was permitted to remain unsold until it declined in value far below the amount of the balance due the respective banks from the estate on the loans. This was not due to any lack of zeal on the part of the said banks to protect themselves, but rather to the promise of the executor that if they refrained from selling the securities they would be protected. The banks were fully protected but the estate again suffered through the executor's negligence, not only in failing to liquidate the securities supporting these loans and to discharge the liens thereof within a reasonable time, but through being compelled to continue to pay interest on the balance due on such loans. By reason thereof, as an additional surcharge, the executor shall not be allowed any credit in its account for interest payments made subsequent to March 26, 1931, on the balances due on either of these loans.

It is not customary to allow compensation to executors who have been negligent or derelict in the discharge of their duties. (*Matter of Welling's Estate,* 51 App. Div. 355, 64 N. Y. S. 1025; *In re Junkersfeld,* 244 App. Div. 260, 279 N. Y. S. 481; *In re Frame,* 284 N. Y. S. 153.) The executor will, therefore, be surcharged with the amount of commissions with which it has credited itself. Upon paying into the estate the total amount of the surcharge herein indicated and ordered, with legal interest thereon, the executor will be entitled to transfer to itself individually the estate securities which it now holds as pledgee and will be obliged to cancel and discharge its claim or claims as creditor against the estate.

It necessarily follows that the executor should be removed. As a further reason for such removal our attention is called to the fact that in December, 1931, the executor sold $61,000 worth of the estate securities and with the proceeds of such sale purchased certain other speculative securities. This purchase is explained by the statement in the minutes of the meeting of the investment committee of the bank on December 18, 1931, that "in view of the way we are involved in the estate Mr. Traylor feels that we should have it invested in the types of securities which we feel have the best chance of appreciation." The executor admits the impropriety of said purchase and disclaims any right to the ultimate net profit of $22,000 made from the subsequent sale of the purchased securities. The objectors charge that the executor, with the estate at that time in a hopelessly insolvent condition, unlawfully purchased the speculative stocks in question with the estate funds "on the gamble that the market would go up and, to some extent at least, extricate, not the estate but the affiliate from the loss on the loan." The estate then showed, according to the aforesaid minutes, a deficit of $150,000, and it surely was not contemplated that the purchased stocks would appreciate to the extent that that deficit would be overcome or that any benefit would accrue to the estate. The evident purpose of the executor was to reduce the loss on the First National Bank's loan by the chance of appreciation in the price of the purchased stocks. In any event, the action of the executor in this regard was unauthorized and illegal and furnishes an additional ground for its removal.

Other points are urged and numerous cases cited, all of which have been examined and carefully considered, but in the view we take of this cause we feel that further discussion would only serve to unduly lengthen this already long opinion.

For the reasons stated herein the final order of the circuit court of June 5, 1934, overruling the objections to the executor's final account and report for the period ending August 4, 1932, and denying the prayer of the objectors for the removal of said executor and the surcharge of its account, is reversed, and the cause is remanded with directions to the circuit court to sustain the objections to said executor's final account and report for the period ending August 4, 1932, to grant objectors' prayer for the removal of said executor, to order the surcharge of the account of said executor in the manner and to the extent indicated herein, that an accounting be had to determine the amount of such surcharge, and that such other proceedings be had as may be necessary and are not inconsistent with the views expressed herein.

*Reversed and remanded with directions.*

FRIEND and SCANLAN, JJ., concur.