Charles J. Kubin et al., Appellants, v. Chicago Title and Trust Company et al., Appellees.

Gen. No. 41,194.

Opinion
filed November 4, 1940.

Sims, Handy, McKnight & Carey, of Chicago, for appellants; James P. Carey, Jr. and Frank S. Sims, of counsel.

Thomas L. Marshall, Samuel M. Mitchell and Thomas J. Hoban, all of Chicago, for appellees; Harold L. Reeve and Bell, Boyd & Marshall, all of Chicago, of counsel.

Mr. Presiding Justice O'Connor delivered the opinion of the court.

March 8, 1938, Charles J. Kubin, Vlasta J. Kubin, Robert Kubin, Carolyn L. Lame and Adelaide Kubin filed their complaint in chancery against the Chicago Title & Trust Company, trustee, under the will of Otto Kubin, deceased, who was the father of Charles, Robert and Carolyn and the husband of Vlasta (the plaintiffs), to recover losses claimed to have been sustained by them as a result of the failure of the trustee to sell stock and that the trustee be removed. Other parties including Otto Kubin, Jr., a son of the deceased, were made parties defendant. There was a trial before the chancellor, a decree entered dismissing the complaint for want of equity and three of the four children, who were plaintiffs, appeal.

The record discloses that in 1891, Charles J. Vopicka, Otto Kubin and John Kralovec, who were brothers-in-law, together with a few other persons, organized the Bohemian Brewing Company of Chicago, which name was soon after changed to the Atlas Brewing Company, with a capital of $150,000 consisting of 1,500 shares at $100 per share. The principal stockholders and the number of shares held by each were: Vopicka, 415; Kubin, 415; Kralovec, 345; Mrs. Jonas, 100; John Geringer, 50; James Storkan, 25. The remaining 150 shares were held by a few relatives and employees. January 3, 1922, Otto Kubin executed his will and December 17, 1926, a first codicil and a second codicil April 29, 1929. He died May 3, 1929, leaving him surviving his widow, Vlasta J. Kubin and five children, the youngest of which was 27 years old at the time of his death. Four of the children, Charles, Robert, Carolyn and Adelaide, together with their mother, filed the complaint in the instant case, making the other son, Otto, Jr., a defendant.

The complaint was in two counts, the principal interest of the mother, Vlasta J. Kubin, was set up in the second count. It was disposed of during the trial and she is not a party to this appeal. The daughter,

Adelaide, also refused to join in the appeal. At the time Otto Kubin executed his will he owned the 415 shares of stock in the brewery. By the 8th paragraph of the will he gave 165 shares of the stock to the Chicago Title & Trust Company in trust "to collect the issues and profits thereof and pay over the same unto my wife, Vlasta J. Kubin," during her life and upon her death to divide the 165 shares equally among the five children. By the 9th paragraph he gave 250 shares of the stock to the Trust company in trust with directions to the trustee to collect the issues and profits and pay them over to the five children in convenient installments until the youngest child was thirty years of age. By the first codicil this was changed, providing that the profits be paid to the children until ten years after his death. The stock was then to be divided equally among the children. By the 10th paragraph of the will the residue of his estate was devised and bequeathed to the Chicago Title & Trust Company in trust "To hold all of my shares of stock, to collect the issues and profits thereof, with full power to sell and convert into money any part or all of such shares of stock, as to the best interests of my estate may seem to my said trustees," etc.

The Chicago Title & Trust Company was also appointed executor. The will was admitted to probate, the estate administered by the executor and the stock in question turned over by the executor to the trustee. August 6, 1930, Mrs. Kubin, the widow renounced the provisions made for her in the will. After the execution of the will and the first codicil, Otto Kubin acquired 25 shares more of the stock after the renunciation; the trustee delivered to Mrs. Kubin 146⅔ shares of the stock, which included the 25 shares, which, it seemed to be agreed, was disposed of by the 10th paragraph of the will, leaving 293⅓ shares which are the subject matter of the suit. This distribution seems to have been satisfactory and is not questioned.

The question for decision is, was the trustee negligent in failing to sell the 293⅓ shares of stock in July, 1933, or in the balance of that year, during which period plaintiffs contend the stock could have been sold at from $15 to $26 per share? That in 1938, the stock depreciated to approximately $1 per share and plaintiffs' contention is that through the trustee's negligence the loss was sustained and it is liable therefor. On the other side, the trustee's position is that it was guilty of no negligence; that the stock could not have been sold and the decree of the chancellor was the only one the evidence warrants.

The evidence shows the question of the sale of the stock by the trustee was discussed beginning in June, 1933, and eminent lawyers, retained by the trustee, as well as counsel who were in the employ of the Chicago Title & Trust Company, were of opinion that the will of Otto Kubin gave no power to the trustee to sell the stock. Thereafter, in July a bill was prepared by counsel with a view of having a court of chancery decree that the trustee might sell the stock. The bill was sworn to by H. J. Tansley, secretary of the Chicago Title & Trust Company, trustee, but was not filed in the circuit court of Cook county until November 1, 1933. The prayer of the bill was that the court construe the provisions of paragraphs 8 and 9 of the will and advise the trustee as to its rights and duties and as to how many shares, if any, of the stock the trustee should continue to hold; that the court construe the will as to whether the trustee had power under the terms of the will to sell the stock and if the will was so construed, that the court instruct the trustee either to sell or not to sell the stock. The bill set up the effective date of the 18th Amendment to the United States Constitution, the passage of the Volstead Act and the amendment thereof, and as a result of this amendment it was alleged the earnings and profits

had been greatly increased; also a large number of other breweries had opened up for business which had theretofore been dismantled during the prohibition era and that the repeal of the 18th Amendment, in the opinion of some, might cause the profits of the brewery "to very greatly decrease;" that the brewery had been in operation 42 years and would have to be rehabilitated and the stock was "an unwise investment" and it should be sold and converted into cash and invested in other "less speculative securities."

It was further alleged that in December, 1932, the capital construction of the brewery was changed, the number of shares increased from 1,500 to 300,000 and the par value reduced from $100 to $5 per share. The new shares were given to the existing stockholders for the old—200 shares for 1. The trustee still holds the new shares; that complainant believed the stock could be "sold for a price in excess of $15 per share" and that if not sold it probably would greatly decline in value and the trustee "as a result thereof, may be charged with negligence in failing to make such a sale and may possibly be liable to the beneficiaries . . . for its failure to make such a sale," and that no specific power was given the trustee under the 8th or 9th paragraphs of the will to sell the stock.

The five children of the deceased, all of whom were adults, and some other collateral heirs, were made parties to the bill and it appears all were served except one. But the record discloses nothing further was done except the trustee consulted with its counsel and apparently decided not to go ahead with the case and July 1, 1937, the suit was dismissed by the court for want of prosecution.

Henry J. Tansley, secretary of the Chicago Title & Trust Company, the trustee, became one of five directors of the brewery. He had principal charge of the estate for the trustee although he from time to time

conferred with the president, Mr. Pettibone, Mr. Davis, the trust officer, and the attorneys for the Chicago Title & Trust Company.

The trial began December 15, 1938, and on the next day Mr. Tansley was called by plaintiff under § 60 of the Civil Practice Act and interrogated by counsel for plaintiffs on the afternoons of December 16, 19, 21 and 22, the case having been adjourned from day to day. December 22, it was continued to the morning of December 27, but before convening on that day Mr. Tansley died suddenly, his examination by plaintiffs' counsel not having been completed. The hearing was adjourned to January 3, 1939. The record is voluminous. There was a protracted hearing over a period of six months and the decree was entered dismissing the suit for want of equity August 18, 1939.

The evidence shows that from the time the brewery was founded in 1891 it was a financial success, earning and paying large dividends and from 1929 to 1932, inclusive, the average yearly earnings for each $100 share were more than $482 and for the first seven months of 1933, when the manufacture and sale of beer was legalized, the earnings were more than $596 per original share. From 1921 to 1928, the average yearly earnings on a $100 share were $187.94; from 1929 to 1932, $482.45 and 1933 were $561.13. In 1933, from the first of the year to August 1, the net profits were $725,-760.38 and from August 1 to the end of 1933, there was a loss of $37,414.95. Between April and October of that year the directors authorized and there was paid out $600,000 in cash dividends, about 82 per cent of the company's net profits. At that time there were no bank loans and no funded debt; there was no mortgage on the property, but February 13, 1934, the brewery borrowed $100,000 and in April $75,000 more. These loans were in that year reduced to $110,000. The net profits in 1934 were more than $22,000, a decrease of more than $700,000 as compared with 1933. In 1935,

there was a loss of about $235,000 and in 1936, there was a net profit of more than $55,000. In 1937, the brewery went into bankruptcy under § 77B of the Bankruptcy Act and in 1938, a plan of reorganization was approved, the indebtedness funded in bonds and the stock was placed in a voting trust. In 1938, the brewery earned $188,957.04, which was in excess of its earnings of 1928, which were $174,311.85. It was practically a family owned brewery, the principal stockholders were as hereinbefore stated. It was operated by the principal stockholders, Mr. Vopicka, Mr. Kubin and in later years Anton Laadt was manager of the brewery—his wife was a daughter of one of the original stockholders. The stock was held substantially throughout its life by the same stockholders; it was not listed on any exchange and there were few sales. The principal stockholders held their stock and Mr. Vopicka was very optimistic even after the decline of the stock following the repeal of prohibition in 1933, and refused to consider the sale of any of his stock for any of the suggested prices. His attitude shows he considered such prices grossly inadequate—so much so as not to be considered.

As above stated, Mr. Tansley died suddenly before his cross-examination by plaintiffs under § 60 was completed and shortly thereafter defendant trustee moved to strike his testimony on the ground that they had no opportunity to cross-examine him. The matter was argued and briefs submitted, the motion sustained and the testimony stricken, except certain exhibits which had been identified by him. Had Mr. Tansley not died, counsel for the trustee would have the right immediately at the conclusion of his examination by counsel for plaintiffs to examine him as to all matters relative to which he had been interrogated. *Colekin v. Bamborough,* 159 Ill. App. 130; *Combs v. Younge,* 281 Ill. App. 339; *Blumb v. Getz,* 294 Ill. App. 432; *Branch v. Woulfe,* 300 Ill. App. 472; *Guse v. Power &*

*Mining Machinery Co.,* 151 Wis. 400 (139 N. W. 195);
*Jonescu v. Olrich,* 208 Mich. 89 (175 N. W. 174).

Plaintiffs contend the court erred in striking the
testimony of Mr. Tansley and authorities are cited,
analyzed and applied in support of this, some of which
are: *Randall v. Atkinson,* 30 Ont. Rep. 242; § 1469, Vol.
2 (12th Ed.) Taylor on Evidence; *Scott v. McCann,* 76
Md. 47. We do not stop to analyze these cases except
to say that in the *Scott* case the Supreme Court of
Maryland held that the strong preponderance of au-
thority in equity cases renders the testimony of a
witness who died suddenly before cross-examination
admissible, and continuing the court there said: "In
the case we are considering there is very strong reasons
[reason] for receiving the testimony objected to, be-
cause of our statute on the subject, which puts parties
to a contract on a plane of mutuality in cases of death.
. . . In this case the plaintiff had testified as to his
recollection of the matter involved, that is to say, as
to the payments made by the defendant to him; and
the defendant having testified on his own behalf, sud-
denly died before the cross-examination could be had,
so that the rule of mutuality would require the con-
sideration of the testimony of the witness thus dying,
or the striking out of the testimony given by the plain-
tiff." On the other side, counsel for the trustee cites
authorities holding that where a witness testifies and
dies suddenly before cross-examination, his testimony
must be stricken, some of which cases are: *People v.
Cole,* 43 N. Y. 508; *Sperry v. Estate of Moore,* 42 Mich.
353, 4 N. W. 13; *Kemble v. Lyons,* 184 Iowa 804, 169
N. W. 117; § 1390, Vol. V. (3rd Ed.) Wigmore on
Evidence. We think the correct rule is stated by Dean
Wigmore in the section cited. The author there says,
"where the death or illness prevents cross-examination
under such circumstances that *no responsibility* of any
sort can be attributed to either the witness or his party,
it seems harsh measure to strike out all that has been

obtained on the direct examination. Principle requires in strictness nothing less. But the true solution would be to avoid any inflexible rule, and to leave it to the trial judge to admit the direct examination so far as the loss of cross-examination can be shown to him to be not in that instance a material loss."

In the instant case counsel for plaintiffs, in their argument on this point, in no way analyze the testimony of the witness. There is no suggestion that the testimony was vital and of a character that would tend to sustain plaintiffs' case. We agree with counsel for the trustee when in replying to plaintiffs' contention they say, "Upon the entire record, it is difficult to comprehend just what the appellants are complaining about or wherein they contend they were injured by the striking of Tansley's partial testimony, even if the ruling were wrong." In these circumstances we are of opinion that the court ought not be required to search through the testimony to see whether the ruling of the court prejudicially affected plaintiffs.

Plaintiffs next contend that "The diligence imposed by law on the Trustee required it to sell the stock without unreasonable delay." The evidence is then discussed showing the history of the brewery, the effect of the prohibition law and of its repeal, the action of the board of directors in increasing the number of shares of the stock and decreasing the value of the shares. The evidence of a number of witnesses is discussed, including the testimony of Mr. Pettibone, president of the Chicago Title & Trust Company, attorney Cartwright, who represented the Trustee in the preparation of the bill filed in 1933, as above stated, and the testimony of Mr. Tansley is referred to and discussed as though it had not been stricken.

We do not discuss the evidence in detail because we are of opinion that there was no bona fide offer made for the stock and probably none could have been received because the claimed offers to buy some of the

stock were coupled with conditions such as to what should be done in the way of other stockholders not selling, etc. We agree with the chancellor when, in deciding the case, he referred to the testimony of two witnesses called by plaintiffs which tended to show they had obtained a purchaser for some of the stock, when he said, "I didn't think so much of their efforts to buy."

Mr. Vopicka, one of the founders of the brewery (and a large stockholder throughout the time of its existence) and in fact other stockholders, were opposed to selling any stock at a price anywhere near the price suggested in 1933. They had been receiving large dividends for years, the stock had been very valuable and the prices offered were, in their opinions, wholly inadequate and not to be considered. There is no evidence that any of plaintiffs, although some of them worked at the brewery for years, ever requested the trustee to sell the stock in which they were beneficially interested. And in fact, none of the plaintiffs, except Carolyn, were called as witnesses by their counsel and Carolyn merely identified a letter. The evidence shows that even after the stock decreased in price, some of the old stockholders bought other shares—Carolyn bought 4,100 shares in 1935.

We are unable to agree with plaintiffs' contention that the allegations of the bill of complaint filed by the trustee in 1933, which was introduced in evidence in the instant case, are conclusive upon the trustee. We think it clear the verified bill was admissible in evidence but the weight to be given was to be determined by the chancellor in view of all the evidence in the case.

We are also of opinion the trustee was not authorized to sell the stock under the power conferred by the will and could only do so after a decree of court authorizing such sale was entered. Certainly no trustee would sell the stock without authority from a court.

Paragraphs 8 and 9 gave no such authority and paragraph 10, in which power to sell was given, did not apply to the stock mentioned in paragraphs 8 and 9.

From what we have said, we think it follows that the contention of plaintiffs (that the trustee was not entitled to retain moneys received by it as compensation for Mr. Tansley's services as director of the Atlas Company), cannot be sustained. The evidence showed Mr. Tansley was employed by the Chicago Title & Trust Company; that he put in a great deal of time acting as director of the company and no complaint is made that the amount paid was excessive.

Upon a consideration of all the evidence in the record, including the testimony of Mr. Tansley, we are of opinion the decree of the court, dismissing the bill for want of equity, is the only decree that could be sustained by a court of review. Certain it is that we cannot say the finding of the chancellor in defendants' favor is against the manifest weight of the evidence. In these circumstances, the decree of the circuit court of Cook county must be, and it is affirmed.

*Decree affirmed.*

MATCHETT, J., and McSURELY, J., concur.