69 Ill. App.3d 714 (1979)
388 N.E.2d 148
In re ESTATE OF ROY W. LINDBERG, Deceased.  (ALVAR G. LINDBERG et al., Petitioners-Appellants,
v.
BEVERLY BANK, Respondent-Appellee.)
No. 78-631.
Illinois Appellate Court  First District (2nd Division).
Opinion filed March 13, 1979.
*715 Klein, Thorpe and Jankins, Ltd., of Chicago (Gerard E. Dempsey and Gregory A. Thorpe, of counsel), for appellants.
Anagnost & Anagnost, of Chicago (Catherine Cook Anagnost and David H. Armstrong, of counsel), for appellee.
Reversed and remanded.
Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:
This action was brought by certain of the beneficiaries (petitioners) under the will of Roy W. Lindberg, decedent, against the Beverly Bank (the Bank) as executor. The action sought removal of the Bank as executor and raised objections to the executor's first and final account. The objections focused chiefly on the Bank's delay in liquidating the principal asset of the estate, 2000 shares of stock in the Bank's parent holding company, the Beverly Bancorporation (Bancorp), which decedent had acquired during his lifetime while employed at the Bank. The stock, which was valued at $70 per share at the time of decedent's death and the Bank's appointment as executor, had fallen to a price of $27 per share by the time the Bank sold it.
The action was tried without a jury. At the close of petitioners' case-in-chief, and after the court had heard two defense witnesses and additional rebuttal testimony for petitioners, the court granted the Bank's motion for a directed finding, dismissing the petition and overruling the objections. On appeal, petitioners have raised issues relating to the standard of care and burden of proof applicable to the Bank as executor, as well as possible conflicts of interest and self-dealing, but in our view the chief issue presented is whether the trial court's finding that the Bank acted in a reasonably prudent manner in the disposition of decedent's stock is against the manifest weight of the evidence. The pertinent facts follow.
Roy W. Lindberg, decedent, was employed by the Bank from about 1926 until his death on July 24, 1973. His handwritten will, which was admitted to probate, nominated the Bank as executor, and the Bank was appointed executor on September 24, 1973. In his will, decedent left his real estate and all personal possessions on the premises to his brother, Alvar G. Lindberg, and Alvar's wife, Ellen. He then made three specific bequests of $5000 each, to St. Philip Lutheran Church of Blue Island, *716 Illinois; the Rosicrucian Order (AMORC), San Jose, California; and the Beverly Club of the Beverly Bank, Chicago, Illinois. The residue of the estate was left to nine persons: Alvar G. Lindberg, Ellen Lindberg, Lea Lindberg, Francis Lindberg, Leann Lindberg Harmon, Lorraine Stam, Robert Stam, Betty Jane Klos, and Carol Stam White. Decedent's will gave no direction or power to the Bank regarding the retention or distribution of the assets of the residuary estate.
Included in decedent's residuary estate, and comprising the principal asset of his entire estate, were 2000 shares of stock in Bancorp. Bancorp is a one-bank holding company which owns all of the shares of the Bank except for the Bank's directors' qualifying shares. At the time, the Bank constituted over 95% of Bancorp's assets. The officers of the two are the same. There are approximately 375 shareholders of Bancorp and 172,924 shares of Bancorp stock outstanding. Bancorp stock is not listed on any exchange and is normally traded over the counter.
The Illinois inheritance tax return filed by the Bank as executor indicated that the value of decedent's stock in Bancorp was $70 per share as of decedent's date of death. The Federal Estate Tax return filed by the Bank valued the stock at $60 per share as of January 24, 1974, six months after decedent's date of death. The Bank made inheritance and estate tax payments based upon these valuations. In July of 1974, apparently also based upon these valuations, the Bank made a cash distribution to Francis Lindberg, one of the residuary legatees, in the amount of $8655. This was almost $5000 more than the Bank's final account showed was due him, and the Bank has not charged the estate for the amount of the overpayment.
On March 21, 1975, the Bank distributed 83 shares of decedent's Bancorp stock to the Rosicrucian Order. This distribution was made in kind, in partial satisfaction of a specific bequest, and the Rosicrucian Order agreed to accept the stock at its Federal Estate Tax valuation, or $60 per share. Similarly, the Beverly Club agreed to accept 83 shares of Bancorp stock (or 75 shares net after taxes) at $60 per share.
On February 2 and February 5, 1976, more than 30 months after decedent's death and more than 28 months after the Bank was appointed executor, the Bank sold the 1834 shares of Bancorp stock remaining in the estate. The three purchasers were: Victor Apa, who was at the time a vice president of both Bancorp and the Bank; James Mahoney, who was then only a shareholder in Bancorp but who later became a director of both Bancorp and the Bank; and Mrs. Evelyn Kyes, a close friend of the Bank's president.
The Bank sold the shares at a price of $27 per share. While the book value of the stock was $55 per share, it is not disputed that $27 per share was, or was very close to, the fair market value of the stock in early 1976, as the stock had greatly declined in value from the time of decedent's *717 death. Both facts are illustrated in the following table, constructed out of testimony based on Bancorp's stock ledger record, which reflects all transfers of Bancorp stock from the time of decedent's death on July 24, 1973, through the Bank's appointment as executor on September 24, 1973, and just beyond the sale of decedent's Bancorp stock in early February of 1976:

 Number Price
 Date of Shares Per Share
July 31, 1973 3,000 $70.00
September 10 15 70.00
December 7 12 70.00
February 22, 1974 1,500 60.00
February 22 116 54.50
May 1,100 57.50
June 12 14,500 57.50
June 22 8 57.50
June 25 10 [not known]
September 11 196 40.00
December 31 159 27.50
February 24, 1975 22 27.50
April 118 28.00
June 118 27.50
June 23 26.00
July 12 30.00
September 20 26.00
November 843 27.50
November 100 27.50
November 240 27.50
November 27 25.00
December 474 27.00
December 70 27.00
December 800 27.00
December 16,768 20.00
December 4 27.50
January 14, 1976 1,000 20.00
January 19 16 27.00
February 3 500 27.00
February 6 221 27.00
February 6 50 27.00
February 6 650 27.00
February 6 684 27.00
March 15 500 27.00

*718 The beneficiaries of the estate were not notified of the sale, nor was any current account filed during the administration of the estate. On February 13, 1976, after it had already sold all 1834 shares of Bancorp stock in the estate, the Bank then petitioned the court for permission to sell 750 shares of the stock at $27 per share, which was granted. The identities of the purchasers were not disclosed nor was notice of the petition given to the beneficiaries.
There were no audits of the estate's tax returns, nor were any contested claims filed or challenges to the will made. The executor's fee, all taxes, most attorney's fees, and all other administration expenses were paid by the end of 1974. According to James A. Boyd, the Bank's senior trust officer, it was only the need for liquidation of estate assets to make up for the overdraft caused by payment of these expenses that kept the estate open as long as it was. Boyd testified that he became aware of the overdraft upon becoming employed by the Bank in October of 1975. It was chiefly this awareness on the part of Boyd that prompted the sale of the stock, and it was through Boyd that buyers for the stock were found. Boyd made no other attempt to find a buyer, and he did not contact any brokers regarding either potential purchasers or possible sales prices. He did not ask the legatees before the sale whether they wanted distribution of the stock in kind, as he knew that they had rejected that in the past. Finally, as custodian of the estate's file, he testified that the file indicated no attempt to sell the stock by any of Boyd's predecessors.
Petitioners also called Robert F. Hanson, vice president and secretary of both Bancorp and the Bank, under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). As secretary of both corporations, Hanson maintained their records, including Bancorp's stock ledger record, from which he testified. Hanson testified about one transaction in particular, the sale in June of 1974 of 14,500 shares of Bancorp stock at $57.50 per share. The sale, for cash, was by the Northern Trust, the nominee of the University of Chicago in selling the stock. The sale was to an Illinois corporation named the Beverly Agency (the Agency). Hanson is also the secretary of the Agency, and the Agency's three directors are also directors of the Bank. The Agency has 55-60 shareholders, some of whom were also shareholders of Bancorp and of the Bank. While the Agency has a small insurance division, it obtained the cash to acquire the Bancorp stock from the proceeds of its sale of its controlling interest in another bank. While Hanson testified that the purchase did not give the Agency a controlling interest in Bancorp, he stated that the Agency became the majority shareholder of Bancorp stock and remained the principal owner until March of 1977. As secretary of the Agency, Hanson attended the meeting at which the purchase was authorized, but he could not say how the price of $57.50 was arrived at, although he knew there *719 were negotiations before the sale. He could not testify whether the estate's Bancorp stock was ever offered to the Agency, and Boyd testified that to his knowledge, no one ever tried to sell the stock to the Agency.
As secretary of Bancorp, Hanson came into day-to-day contact with buyers and sellers of Bancorp stock, but he did not participate in actual sales, only in the mechanical transfer of stock. He stated that he was informed at least once that decedent's Bancorp stock was for sale, but he could not recall ever having discussed finding a buyer with Boyd or with Boyd's predecessor as senior trust officer, John Pollock, even though Hanson was in charge of the Bank's trust division for several weeks in September and October of 1975, after Pollock had left and before Boyd was hired.
Hanson testified that SEC regulations did not permit him or the Bank to find or create a market for Bancorp stock. However, he testified that as secretary of Bancorp, he uses the services of a broker, Bacon Whipple & Co., for transfers of Bancorp stock, and Bacon Whipple still serves as market maker for Bancorp stock; according to Hanson, the Bank wants brokers to create a market for Bancorp stock, but does not ask them to do so. However, he testified that the Bank's trust division may, in the past, have used a broker to find buyers and sellers of Bancorp stock, and he knew that another broker, Swift Henke & Co., made a small market for Bancorp's stock in 1974. He testified that there were buyers and sellers of Bancorp stock in small quantities in 1974 and that Swift Henke negotiated the sale that took place in September of 1974. However, Hanson did not, nor to his knowledge did anyone from the Bank, ever contact either broker or any other broker regarding finding a buyer for the estate's stock. Finally, as keeper of the minutes of the Bank's directors trust committee, Hanson testified that in only one instance in the minutes was there any mention of the possible sale of the estate's stock, and that was on January 21, 1976.
Plaintiff also called Isaac Moore, president and chief executive officer of Bancorp and the Bank, as an adverse witness. Moore became president in July of 1975; he has been with the Bank since 1964 and with Bancorp from its inception in 1969. Moore first became aware that the estate's stock was available for sale in March of 1974 or before, when Pollock, then senior trust officer, told him that he was having trouble finding a buyer for the stock. In May of 1974, out in the hallway during Bancorp's annual meeting, Moore mentioned the fact that there was Bancorp stock available for sale to Larry Kahme, an existing shareholder. However, Moore did not consider it his function to market Bancorp stock, because he was not then president and marketing was generally to be done by the president of the Bank and, in this instance, the senior trust officer. Therefore, Moore never discussed the matter with anyone again *720 until after July of 1975, when he became president. He then tried to market the estate's stock himself by telling people that Bancorp stock in general was available. He did not discuss the estate's stock in particular with any brokers and did not direct Pollock or Boyd to do so, but he did discuss making a market in Bancorp stock generally with brokers and, he testified, there was no interest. Moore has customarily attended meetings of the directors trust committee since 1974, and while he stated that he would guess that the matter of decedent's stock came up every other month, he conceded that this should have been noted in the minutes if the discussion were part of an estate review.
Moore then testified concerning the Agency's purchase of 14,500 shares of Bancorp stock at $57.50 per share in June of 1974. Moore heard that negotiations were in progress before the sale took place, but he did not know if the Agency's board of directors knew at the time that the estate's 2000 shares of Bancorp stock were for sale. He doubted very much whether anyone ever brought this fact to the Agency's attention, as it was a "separate corporation," and to his knowledge no one ever did.
Moore also testified concerning the decline in value of Bancorp's stock. Because the Bank constituted over 95% of Bancorp's assets, the Bank's performance was critical to the value of Bancorp stock. Moore testified that between September of 1973 and February of 1976, he was fully aware of a "general climate" that was causing the stock to become depressed. He stated that prior to 1973, banks could maintain a capital ratio of 4 1/2 to 5%, but by 1976, banks were being pressured to maintain a reserve of 7, 7 1/2, or even 8% of capital to assets. This phenomenon, which was corroborated by a Federal Deposit Insurance Corporation bank examiner, was depressing the value of bank stocks such as Bancorp's throughout the country during the period in question. Moore later testified that the Bank increased its capital ratio from 5 1/2% at the beginning of 1973 to 7% by the end of 1974.
Several beneficiaries testified that they inquired whether the estate's stock had been sold at various times in 1974 and 1975, but the response that they received, if any, was that there was no market for the stock and the Bank could not find a buyer. One beneficiary was called by the Bank as an adverse witness when petitioners' lawyer stated that their last witness could not be there till the following day in court.
Lawrence Kahme then testified for the defense. He stated that in May of 1974, Pollock offered him 2000 shares of Bancorp stock at $40 per share; he also discussed the matter with Hanson. Kahme testified that he found out that some of the stock, possibly 100 shares, had been sold to a Bancorp director for $27.50 per share, although Hanson's records list the first sale at that price as occurring on December 31, 1974. Kahme therefore told Pollock that he was not interested at $40 per share. Kahme testified that he *721 was not told that the proffered stock was from the estate, and he did not know of any announcement to shareholders ever having been made at Bancorp's annual meeting or any other time regarding the availability of the estate's 2000 shares.
When the Bank moved for a directed finding, petitioners objected to the court's consideration of the testimony of Kahme, a defense witness, in ruling on the motion. The court instructed petitioners that they could bring in rebuttal testimony, which they attempted, and the defense was also permitted a brief rebuttal. The court then granted the Bank's motion for a directed finding.
Section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 64(3)) provides that a defense motion for a directed finding may be made at the close of plaintiff's case, and if the ruling is adverse to the defendant, he may then adduce evidence in support of his defense. We note that the procedure employed by the trial court in the case at bar departed from the pattern contemplated by the statute and could constitute a source of needless confusion. Fortunately, the standard of review of a directed finding is the same as that after a complete bench trial: whether the trial court's determination is manifestly erroneous. (Bilyeu v. Plant (1966), 75 Ill. App.2d 109, 119, 220 N.E.2d 513.) Accordingly, we proceed to the issues on appeal.
 1 Petitioners' first contention is that the Bank, as a professional fiduciary which has held itself out as having greater than average expertise, must be judged by that higher standard. While the acts of an executor must be judged by the context in which he acted (In re Estate of Busby (1937), 288 Ill. App. 500, 519-22, 6 N.E.2d 451), in Illinois a corporate executor is held to no higher standard than an individual executor. (In re Estate of Venturelli (1977), 54 Ill. App.3d 997, 1002, 370 N.E.2d 290.) In either case, the fiduciary must act with the highest degree of fidelity, with the utmost good faith, and with that degree of skill and diligence which an ordinarily prudent man bestows upon his own similar affairs. (Christy v. Christy (1907), 225 Ill. 547, 552-53, 80 N.E. 242; In re Estate of Vanderwater (1945), 326 Ill. App. 81, 61 N.E.2d 392 (abstract); cf. section 5 of the Trusts and Trustees Act, Ill. Rev. Stat. 1977, ch. 148, par. 105 (statutory application of the prudent man rule to trustees).
 2 Petitioners next contend that the Bank, in retaining stock in its parent corporation for 28 months, failed in its duty to administer the estate solely in the interests of the beneficiaries. Petitioners assert that this conflict of interest had three facets. First, the Bank had to consider whether a sale of the stock might tend to depress the value of the stock of its corporate parent. However, petitioners did not produce any evidence that an estate sale of approximately 1% of the stock outstanding would have had such a tendency (compare People v. Canton National Bank (1937), 288 Ill. App. 418, *722 6 N.E.2d 220 (trustee bank refused to sell 26% of bank's stock in falling market despite existence of a good offer)), and we believe that something more than the barest possibility should be required. (Compare City Bank Farmers Trust Co. v. Cannon (1943), 291 N.Y. 125, 51 N.E.2d 674.) Moreover, in Elmhurst National Bank v. Glos (1968), 99 Ill. App.2d 74, 241 N.E.2d 121, the court held that a trustee bank could continue to hold its own stock in trust, so long as it did so in accord with the statutory prudent man rule applicable to trustees (now at Ill. Rev. Stat. 1977, ch. 148, par. 105). While that statute is not strictly applicable here, in that no formal trust is involved, the logic of the ruling in Glos would seem to apply equally in the case at bar, thus permitting the Bank to retain its own stock in accord with the common law prudent man standard set out in Christy v. Christy (1907), 225 Ill. 547, 552-53, 80 N.E. 242, discussed above. However, we note that the Bank could have taken various precautionary measures, such as petitioning an informed court for instructions, as did the trustee in Glos.
The second facet of the conflict alleged by petitioners is the question of voting the stock. This contention similarly fails on the twin grounds of a complete lack of evidence and the ruling in Glos that the stock could be retained according to the prudent man rule. Once again we note, however, that prophylactic measures could have been taken, but were not.
Third, petitioners argue that the Bank was in a conflict of interest since there was testimony that SEC regulations do not permit the Bank to initiate the sale of Bancorp stock; yet, petitioners having declined to accept disposition in kind, the Bank was under a duty to liquidate the Bancorp stock in the estate. However, no such regulations were ever cited or produced by the parties, despite our request, and even if such regulations do exist, there was ample testimony that the Bank did attempt to market Bancorp stock at times, particularly after Moore became president in July of 1975. Thus, this facet of the alleged conflict would seem to be unsupported by the record. Nevertheless, the possibility of a conflict remains a factor to be considered on the general issue of whether the Bank acted in a reasonably prudent manner in the disposition of the estate's stock, a question which we have yet to consider.
 3 The next issue raised by petitioners is whether the Bank was guilty of self-dealing in selling Bancorp stock to an officer of Bancorp and the Bank. Petitioners point out that the stock was sold at $27 per share when its book value was $55. However, book value is not necessarily determinative of market value (Lytton v. Cole (1964), 54 Ill. App.2d 161, 177, 203 N.E.2d 590), and, as we have noted above based on the stock ledger record, $27 would seem to have been very near or at the actual market value of the stock at the time of the sale. Unlike the cases cited by *723 petitioners, there is no indication that the price of the stock ever rebounded to give the purchaser large profits, or that the purchaser was in any way connected with the administration of the estate or acting for anyone who was. (Compare Schultz v. O'Hearn (1925), 319 Ill. 244, 149 N.E. 808; Shearman v. Cooper (1920), 294 Ill. 314, 128 N.E. 559; Joliet Trust & Savings Bank v. Ingalls (1934), 276 Ill. App. 445.) In view of these facts, we cannot find manifestly erroneous the trial court's finding that this aspect of the sale by itself did not raise "reasonable grounds for suspicion" sufficient to shift to the Bank the burden of proving its conduct was above reproach. (Cf. In re Estate of Lucas (1978), 71 Ill.2d 277, 375 N.E.2d 112; In re Estate of Glenos (1964), 50 Ill. App.2d 89, 200 N.E.2d 65.) Nevertheless, we note once again that the Bank could have petitioned an informed court for permission to sell estate property to its own officer.
 4 Petitioners also assert that the Bank's sale to its officer violated section 5 of the Illinois Banking Act (Ill. Rev. Stat. 1975, ch. 16 1/2, par. 105), which sets forth the general corporate powers of banks subject to the Act, and then provides in section 5(11) as follows:
"Notwithstanding any other provisions of this Act, to do any act and to own, possess and carry as assets property of such character, including stock, which is at the time authorized or permitted to National Banks by an Act of Congress, but subject always to the same limitations and restrictions as are applicable to National Banks by the pertinent Federal law."
Petitioners then cite, as a pertinent Federal law, 12 C.F.R. § 9.12(b) (1975), which provides inter alia that property held by a national bank shall not be sold to the bank's officers, with exceptions not applicable here.
While it is not without ingenuity, we believe that this argument is ultimately without merit. Section 5 of the Banking Act merely spells out some of the general corporate powers possessed by banks subject to the Act; section 5(11) merely adds all powers possessed by national banks, as restricted by Federal law. As a matter of pure corporate power, it seems beyond doubt that the Bank as executor had the power to sell estate assets to its officer; whether any liability attaches to the exercise of that power is a different question entirely, and one which we have just considered above. Thus, we do not find the violation of the Illinois Banking Act alleged by petitioners.
 5 Petitioners' next contention is that the Bank failed in its duty to dispose of the stock within a reasonable time. Petitioners assert that the Bank's delay in selling the stock, both by itself and particularly when viewed in light of the other circumstances surrounding the sale, demonstrates that the court's finding that the Bank acted in a reasonably prudent manner in the disposition of decedent's stock is against the manifest weight of the evidence. We agree. As we have noted, the Bank *724 was charged with the duty of administering the estate with at least that degree of skill and diligence which an ordinarily prudent man would bestow upon his own similar affairs. (See, e.g., Christy v. Christy (1907), 225 Ill. 547, 80 N.E. 242.) Since decedent's will was silent on the question of retaining or selling the stock, and the beneficiaries had declined to accept distribution in kind, the Bank was under a duty to liquidate the stock within a reasonable time. (Cf. Paul v. Girard Trust Co. (7th Cir.1941), 124 F.2d 809 (applying Pennsylvania law).) While what is a reasonable time necessarily varies from case to case (Annot., 92 A.L.R. 436, 441 (1934)), for our purposes the crucial time period extends from the Bank's appointment as executor on September 23, 1973, when the stock was still at $70 per share, to December 31, 1974, when the stock first hit $27.50 per share, a level from which it never recovered and the approximate price at which the estate's stock was sold. The question then is whether, during that period, the Bank made a reasonable attempt to sell the stock under the circumstances.
 6 Upon examination of those circumstances, we hold that it did not. The Bank knew that the price of the stock was falling, and had no reason to believe that the decline would ever be reversed. Yet the evidence showed that the Bank made only one attempt to sell the stock during the period in question, even though the Bank knew that there were other buyers in the market at the time. Indeed, the Agency, a related corporation and the chief purchaser of Bancorp stock, was buying a block of stock over seven times larger than the estate's in May of 1974, in the middle of the critical period. Yet the testimony was that no one ever offered the estate's stock to the Agency or anyone else except Kahme. While the Bank repeatedly refers to the Agency's purchase as a "negotiated sale," we cannot see how this shibboleth sets that sale apart from any other. The Bank's inaction in the face of knowledge that the market was falling and that buyers were available demonstrates a breach of its duty as executor. (In re Estate of Busby (1937), 288 Ill. App. 500, 523-24, 6 N.E.2d 451.) Quite simply, an ordinarily prudent man, conducting his own affairs in similar circumstances, would have made more of an effort to sell the stock. (See People v. Canton National Bank (1937), 288 Ill. App. 418, 6 N.E.2d 220. We therefore hold that petitioners made out a sufficient showing to require the Bank to go forward with evidence that it did act reasonably and prudently in the disposition of the stock.
The Bank claims that SEC regulations did not permit it to make a market for Bancorp stock. Again, not only were no such regulations ever produced, but also there was testimony that the Bank had used brokers to create a market in the past and that the Bank did attempt to make a market after Moore became president in July of 1975, after the price of *725 the stock had already declined. Moreover, even if there were such regulations, their existence would appear to make questionable the Bank's ability to perform as executor and the reasonableness of the Bank's conduct in accepting the appointment.
The Bank then contends that there was no evidence that the Bank ever refused an offer, that an offer could have been received, or that there was any market. To this we respond that, based on the evidence submitted by petitioners, the Bank made almost no attempt to elicit an offer, to create a market, or to tap the existing market for an offer, though it was under a duty to do so.
The Bank also cites many cases in which trustees, executors, or administrators were not held liable for failing to dispose of assets which were declining in value, or in the converse situation, for disposing of assets which then rose in value. (See, e.g., Christy v. Christy (1907), 225 Ill. 547, 80 N.E. 242; In re Estate of Vanderwater (1945), 326 Ill. App. 81, 61 N.E.2d 392 (abstract); Hatfield v. First National Bank (1942), 317 Ill. App. 169, 46 N.E.2d 94; Kubin v. Chicago Title & Trust Co. (1940), 307 Ill. App. 12, 29 N.E.2d 859.) However, these cases, even those involving closely held securities for which there was almost no market, are distinguishable in that the stock price fluctuation was either unforeseeable or reasonably considered to be temporary, and in some cases the trustee was specifically directed to retain the stock. In contrast, in the case at bar, petitioners' evidence established that the Bank knew the price of the stock was falling, and had no reason to believe the decline was temporary; that the Bank knew there were buyers in the market; and that the Bank knew the legatees wanted the stock sold. Yet the Bank made almost no effort to sell the stock until it was too late.
Accordingly, we hold that the trial court's finding that the Bank acted in a reasonably prudent manner in the disposition of the stock is against the manifest weight of the evidence. Implicit in our holding is that petitioners made out a sufficient showing to require the Bank to go forward with the evidence, and we therefore need not expressly consider petitioners' arguments with respect to the proper allocation of the burden of proof in cases of this kind. The judgment of the court is reversed and the cause is remanded with directions to permit the Bank to offer additional evidence, if any, on the issue of whether it acted in a reasonably prudent manner in the disposition of decedent's stock, and for other further proceedings not inconsistent with this opinion as may be necessary.
Reversed and remanded with directions.
DOWNING and HARTMAN, JJ., concur.