Susan Kemper HAMILTON,
Plaintiff-Appellant,

v.

Arthur C. NIELSEN, Jr., and American
National Bank and Trust Company,
Defendants-Appellees.

No. 81–1935.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1982.

Decided May 18, 1982.

Albert C. Lum, Lum & Ku, Los Angeles, Cal., for plaintiff-appellant.

John E. Angle, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Milton J. Hamilton died on October 16, 1972, leaving an estate worth about $2.5 million, consisting mainly (more than 80 percent by value) of common stock in two brokerage insurance companies, Frank B. Hall and Company and Zenith United Cor-

poration. Hamilton's will named American National Bank and Trust Company and Arthur C. Nielsen, Jr. as coexecutors, and directed them to pay federal and state death taxes, cash bequests, and costs of administration, and pay over the residue to a trust to be administered by the bank for the benefit of Hamilton's five children, of whom the plaintiff in this action is one. The executors were appointed on November 9, 1972. The will was probated in the Cook County, Illinois, circuit court, which after approving the executors' final account discharged them on December 20, 1977.

This diversity suit had been filed the day before. It charged the executors with having breached their duty of skillful management of the estate by certain of their investment decisions with respect to the Hall and Zenith United Stock. After a bench trial the district judge concluded that the executors had not breached their duty and entered judgment for them. 513 F.Supp. 204 (N.D.Ill.1981). He also awarded them their attorneys' fees in defending this action, to be paid out of the plaintiff's share of the trust.

■■■ We first consider our subject-matter jurisdiction over this suit. Federal courts do not have the power in the exercise of the diversity jurisdiction to probate wills or to interfere with probate proceedings. See, e.g., *Rice v. Rice Foundation*, 610 F.2d 471, 474–76 (7th Cir. 1979); *Blakeney v. Blakeney*, 664 F.2d 433, 434 (5th Cir. 1981). The district court did neither here. Although the complaint was filed the day before the probate proceeding ended, the district court was not asked to enjoin or otherwise impede that proceeding, which was completed as scheduled the next day. The suit does not involve the validity or construction of the will or seek to change the distribution of the assets of the estate decreed by the circuit court of Cook County. All it seeks is an award of money damages against the executors personally for their alleged negligence.

Even so, if Illinois had vested exclusive jurisdiction over such actions in probate courts, as Ohio had done in *Starr v. Rupp*, 421 F.2d 999, 1006 (6th Cir. 1970), it would be arguable that the federal courts were thereby divested of their diversity jurisdiction over such cases. But in fact Illinois has taken the opposite tack. It has abolished separate probate courts and vested the probate jurisdiction in its courts of general jurisdiction, the circuit courts. See Ill. Const. art. 6, § 9; *Alfaro v. Meagher*, 27 Ill.App.3d 292, 295–96, 326 N.E.2d 545, 548 (1975). The Cook County circuit court has subdivided itself into divisions, one of which is the probate division; but this organizational refinement has no jurisdictional significance. "Since both the probate division and the law division are ... simply divisions of the same constitutional court of general jurisdiction, it follows necessarily that both of these tribunals could have had equal and concurrent subject matter jurisdiction over the matter of the appointment of the administrator" of an estate. 27 Ill. App.3d at 296, 326 N.E.2d at 548–59.

This is not to say, of course, that federal courts can now probate wills in Illinois because the state has abolished its specialized probate courts. Probate remains a peculiarly local function which federal courts are ill equipped to perform. But where probate is finished and the federal court is just being asked to surcharge the executor or administrator for a negligent investment decision, the fact that such cases when brought in state courts in Illinois are brought in its courts of general jurisdiction rather than in courts with a specialized probate jurisdiction means that retention of federal diversity jurisdiction over such cases will not interfere with a state policy of channeling all probate-related matters to specialized courts. Of course the federal court's decision may set a standard of conduct that influences future executors and may, by awarding attorneys' fees to the executors, cut down on the beneficiary's share of the estate. But so long as the federal court is faithfully applying Illinois law its decision will not have a systematically different effect than if the action had been brought in the corresponding state court of general jurisdiction.

So we come to the merits. Since the charges against the estate for taxes and

other items were estimated at more than half the value of the estate, the executors knew that they would have to sell much of the common stock—especially the Hall stock which alone accounted for some two-thirds of the estate's value—to pay those charges. (In fact, by the time the estate was closed out almost all of the Hall stock had been sold.) But they faced certain obstacles. Hall was so-called "letter" stock which was not freely salable. And both it and Zenith United were so thinly traded that the sale all at once of a large amount of either stock might have depressed the market price. The number of shares of Hall stock held by the estate equaled the total turnover of the stock in an average day; its holdings of Zenith United were ten times the average daily turnover.

The market value of Hall on the date of Hamilton's death was $26 a share and on the date of appointment of the executors $25. It stayed at this level for the rest of 1972 but began to drop after the first of the year and by January 26, 1973, when the executors made their first (and largest) sale of Hall—almost one-fifth of the estate's total holdings of the stock—the price had dropped to $19. At this time the stock was still unregistered and so could not be sold on the open market. By March, when this cloud was lifted, the market price of Hall stock had plummeted; by the end of the month it was less than $9.50. The executors decided to hold off selling any more for a while. They resumed selling in June, when the price had risen to $12, and sold intermittently until May 1975 at prices ranging from $13 to $18 a share.

The market price of Zenith United stock hovered around $5 a share from Hamilton's death to the end of February 1973. The estate had an option, exercisable in December 1972, to acquire some 9000 additional shares of Zenith United stock at $2.72 a share. The executors exercised the option and acquired these shares, which by the terms of the option could not be sold for two years. In March 1973 the market price of Zenith United began a long and steady decline and on December 15, 1976, the exec-utors sold the entire Zenith United holdings of the estate at $2 a share.

The plaintiff alleges that the executors were negligent in exercising the option to buy additional shares of Zenith United and in failing to sell in 1972, when the price of Hall was still above $20 a share, all the Hall stock that they had to sell to meet the charges on the estate. Late in 1972 a brokerage house expressed serious interest in buying the estate's entire holdings of Hall at a price of one dollar per share under the market. If the executors had sold at this price and had declined to exercise the option to buy additional shares of Zenith United, the estate would have been worth much more on December 20, 1977 (when the estate was closed out), than it was in fact worth on that date.

■ Under Illinois law, the executor or administrator of an estate "must possess the highest degree of fidelity, and utmost good faith, and the skill that an ordinarily prudent man bestows on his own affairs." E.g., *In re Estate of Lindberg*, 98 Ill.App.3d 212, 215, 54 Ill.Dec. 258, 424 N.E.2d 1161, 1163 (1981). There is no suggestion that the executors here were deficient in loyalty or good faith; only their skill is questioned.

■ We can deal quickly with the contention that the executors were negligent to exercise the option on the Zenith United stock. At the time they did so the stock market was booming and the outlook for Zenith United Corporation, according to the reports of securities analysts who were following the stock, was rosy. The market price of the stock would have had to fall by almost 50 percent to make the exercise of the option a losing deal. Of course it did fall by that and more, but this was not foreseen, and on the basis of the facts that the executors knew or reasonably could have known in December 1972 was not likely. And they were taking only a small risk, because the cost of exercising the option, $25,000, was a tiny fraction—roughly one percent—of the total value of the estate at that time.

A more difficult question is presented by the executors' failure to get rid of the Hall

stock as quickly as possible. We do not think they dragged their feet in obtaining the various legal clearances they needed to make the stock freely marketable and before then in hunting for potential buyers of restricted stock; but neither did they act with a sense of urgency. Had they set a high priority on selling quickly as much of the stock as necessary to meet the charges on the estate, they probably could have sold it all in 1972, though at a discount from the market price. They did not act with a sense of urgency, because they thought it much more likely that the price of the stock would rise than that it would fall; the same brokerage house that offered to take the stock off their hands at one dollar under the market price was advising its clients to buy the stock, in the expectation that it would appreciate.

■ But in moving, if not slowly, at least without maximum celerity—though this is understandable in light of the buoyant condition of the stock market in the fall of 1972, when the Dow Jones industrial average was nearly 1000 (it would peak in January 1973, and plunge almost 50 percent by the end of 1974)—the executors were taking chances. The concentration of most of the assets of the estate in the stock of two companies in the same industry made the estate terribly underdiversified, as the executors' counsel conceded at oral argument. Of course this underdiversification was due in the first instance to Hamilton, the testator—was something the executors inherited rather than created. But Hamilton's will did not direct the executors to retain the portfolio he had created, as in *In re Estate of Crowder*, 75 Ill.2d 197, 203, 25 Ill.Dec. 789, 387 N.E.2d 665, 668 (1979). It directed them to close out the estate and place the remaining assets in trust for Hamilton's survivors. This probably means that Hamilton wanted his wealth to be invested more safely after his death than before. We know of no Illinois case that states explicitly that a trustee has a duty to diversify the trust assets, though *In re Sanders' Estate*, 304 Ill.App. 57, 67, 25 N.E.2d 923, 928 (1940), is close; but the duty is generally recognized, see, e.g., Restatement (Second) of Trusts § 228 (1959), and we are reason-ably confident that it is a part of Illinois law and that most Illinois trust settlors therefore expect their trustees to diversify the trust assets unless otherwise instructed.

But it was not the executors who had a duty to diversify the assets; it was the trustee. The executors' duty was to close out the estate as quickly as possible but not so quickly as to reduce its value needlessly. See 3 James, Illinois Probate Law and Practice § 82.6(d), at 84 (1959). By delaying the sale of the Hall stock in the hope of not having to sell it at a discount, the executors were perpetuating the condition of underdiversification that they had inherited and were thereby subjecting the estate to a significant risk. But they did not think they could eliminate that risk without cost. There were two possible costs. One was the discount that a purchaser of the entire bloc of Hall stock held by the estate would have demanded to take it off their hands. So long as the market price of the stock did not actually fall, the executors could avoid this cost by selling off the Hall stock piecemeal rather than all at once. The other and potentially greater cost of a fast sell-off was the loss of the expected appreciation of the stock. However, many students of the stock market believe it generally futile for investment managers to try to outguess the market, see, e.g., Lorie & Hamilton, The Stock Market: Theories and Evidence, ch. 4 (1973), and that is what the executors would have been attempting if they had delayed selling the Hall stock because they thought the market was undervaluing it. Since the duty of the executor is to wind up the estate rather than to increase its value, see *In re Estate of Busby*, 288 Ill.App. 500, 529, 6 N.E.2d 451, 463 (1937), maybe an Illinois court would surcharge an executor who delayed closing out the estate because he thought that the assets in it were undervalued and that the market would soon correct the undervaluation. Maybe it would hold that where as in this case the estate's portfolio is seriously underdiversified and there is no evidence that the testator would have wanted this condition to continue, it is negligent for the executor to

delay winding up the estate even to avoid having to sell estate assets at a discount, so long as the discount is a moderate one.

Fortunately, we do not have to decide these difficult issues—more precisely, attempt to predict how an Illinois court would decide them. The plaintiff is not complaining about underdiversification; she does not argue that the losses that the estate suffered would have been avoided if its assets had not been invested almost entirely in two companies in the same industry. We doubt that if Hamilton had left a highly diversified portfolio of stocks the executors would have been criticized for not liquidating the portfolio to meet the charges on the estate faster than they did; yet they still would have been selling in a falling market throughout 1973 and 1974 and incurring losses for the estate. Maybe the losses would have been smaller than those actually incurred in the sale of the Hall stock, but the plaintiff has not tried to show this. Her theory of the executors' liability is that they did not act as they would have done if they had realized that the stock market was about to plunge. But if that plunge had been generally anticipated, even if just by professional investors, stock prices would not have been rising in the fall of 1972; and lack of clairvoyance is not negligence. "The executor is not chargeable with the gift of prescience or prophecy and its conduct must be judged wholly on the conditions, facts and circumstances with which it was confronted when and after the estate came to its hands." *In re Estate of Busby, supra,* 288 Ill.App. at 520, 6 N.E.2d at 459. See also *Christy v. Christy,* 225 Ill. 547, 553–54, 80 N.E. 242, 243–44 (1907).

Perhaps we should not assume that the pace at which the executors wound up the estate would have been unquestioned if Hamilton had left a diversified portfolio of common stocks. There were fixed (as well as variable, such as tax) charges against the estate. They would make even a diversified portfolio behave as if leveraged. (Borrowing from the estate to exercise the Zenith United option was explicit leverage; not paying the fixed charges immediately was implicit leverage.) And leverage easily can impart a level of risk that, depending

on the beneficiaries' attitude toward risk, is undue. Cf. *In re Estate of Busby, supra,* 288 Ill.App. at 522, 530, 6 N.E.2d at 460, 463. But again we note that the plaintiff is not complaining about the riskiness of the portfolio but about the failure of the executors to act with a celerity that would have been required only if they had, or could be held to have, foreseen the decline in the stock market in general or in the prices of Hall and Zenith United in particular.

*In re Estate of Lindberg,* 69 Ill.App.3d 714, 26 Ill.Dec. 524, 388 N.E.2d 148 (1979), heavily relied on by the plaintiff, is not in point. As in the present case, an executor was accused of negligence for having failed to sell a stock that was the major asset of the estate; but there the resemblance ends. The court found that the executor had failed to make a reasonable effort to sell. Here the executors did make reasonable efforts, albeit they were unwilling to sell at a discount. There the court found that the executor had no reason to believe that the price of the stock would not continue on its downward course. Here the executors reasonably believed that the stock was, if anything, undervalued. They were still taking a risk in not selling immediately, if need be at a discount. But we repeat that the losses of which the plaintiff is complaining were caused by the decline of the stock market rather than by the lack of diversification of the estate's holdings or by the element of leverage that the fixed charges on the estate imparted to those holdings.

■ The remaining question is whether the executors were entitled to have their attorneys' fees reimbursed by the plaintiff, Miss Hamilton. The amount of the fees—$37,000—is not in dispute, nor the fact that Miss Hamilton's interest in the trust under her father's will is only $43,000, so that it will be almost completely wiped out if we sustain the fee award.

■ If the executors were seeking reimbursement of their attorneys' fees from the estate rather than from Miss Hamilton, there would be little doubt that they were entitled to them. An early Illinois case, *Patterson v. Northern Trust Co.,* 286 Ill. 564, 567, 122 N.E. 55, 56 (1919), held in a suit by a

trust beneficiary against the trustee that "a trustee not at fault is entitled to be reimbursed for all his expenses properly incurred in the administration of his trust and has an equitable lien on the trust estate for the same." It is true that the defendant was a trustee rather than an executor—though we cannot see what difference that could make—and that the beneficiary's suit was described as "frivolous, oppressive, and a wrongful attempt to relitigate matters already decided," rather than merely as unsuccessful. 286 Ill. at 567, 122 N.E. at 56–57. Later Illinois cases, however, make clear that a prevailing trustee is entitled to reimbursement as a matter of course. See *Kerner v. Peterson*, 368 Ill. 59, 81, 12 N.E.2d 884, 894 (1937); *Hatfield v. First Nat'l Bank of Danville*, 317 Ill.App. 169, 182, 46 N.E.2d 94, 100 (1942) ("The defendant trustee, not being liable to a surcharge under the decree as affirmed herein, is entitled to recover its reasonable solicitors' fees and costs as assessed by the Chancellor below"). In *Kerner* the defendant was sued as both trustee and executrix and the court made no distinction between these offices so far as entitlement to reimbursement of attorneys' fees was concerned. And in *In re Estate of Minsky*, 59 Ill.App.3d 974, 979, 17 Ill.Dec. 501, 376 N.E.2d 647, 651 (1978), where an executor was denied reimbursement of attorneys' fees because his administration of the estate had demonstrated " 'such a flagrant disregard of duty that to allow him compensation would be to disregard the plain rule of law and shock that sense of natural justice that dwells in the breast of every honest man,' " the court implied that but for this flagrant disregard the executor would have been entitled to his attorneys' fees as in the corresponding case of a trustee. In the present case, of course, there was no disregard of duty, let alone a flagrant disregard.

However, we have found only one case where, as here, the executor's (or trustee's) attorneys' fees were charged against the beneficiary who had brought the unsuccessful suit rather than against the estate (or trust) as a whole. That is the *Patterson* case. The court stated: "Where a benefi-

ciary brings a suit against his trustee which is groundless, the solicitor's fees and expenses of the trustee in defending the charge are to be paid out of the share of the complainant in the trust estate, and not charged against the estate generally nor a general fund by which co-beneficiaries would have to contribute." 286 Ill. at 567, 122 N.E. at 56. The word "groundless" seems significant. Elsewhere, as we noted earlier, the court had referred to the beneficiary's suit as a frivolous, oppressive, and wrongful attempt to relitigate matters already decided. The court even called the beneficiary a "pestiferous litigant." 286 Ill. at 567, 122 N.E. at 56–57. Although Miss Hamilton has lost her suit, we cannot say that it was frivolous or brought in bad faith. We are pointed to no authority that supports a recovery of attorneys' fees against such a plaintiff. But neither is there contrary authority. 3 Page on Wills § 26.148, at 355 (Bowe & Parker eds. 1961), does state that "It is error for the court to tax attorney's fees against specific devisees or legatees." But the only authority cited for this statement, see *id.* at 355 n.49, is a case that bases decision on the limited jurisdiction of traditional probate courts, *In re Rightmire*, 120 Kan. 95, 98, 242 P. 138, 140 (1926); and as pointed out earlier in this opinion, the present case would, if brought in an Illinois court, be brought in one of general jurisdiction. 3 Scott, The Law of Trusts § 188.4, at 1536 (3d ed. 1967), states that "Where the expense of litigation is caused by the unsuccessful attempt of one of the beneficiaries to obtain a greater share of the trust property, the expense may properly be chargeable to that beneficiary's share." This is not that type of case; but it is unclear whether the quoted language is intended to exclude all possibility of charging the beneficiary's share in other types of cases.

We cannot decide this question on the basis of some broad principle of equity or efficiency that might be thought to underlie the rule that allows the executor to get his attorneys' fees reimbursed by the estate as a whole. That rule seems based on nothing

more profound than a recognition that if executors are not reimbursed directly for attorneys' fees incurred in successfully defending their management of the estate, they will simply charge higher administration fees to compensate them for their expected legal expenses, with the result that the estate will bear those costs in the long run whatever the rule. This does not help us decide how the costs to the estate should be allocated among the beneficiaries.

On that question it may however be helpful to note that if Miss Hamilton had succeeded in this action, and she well might have, it is likely although not certain that the other beneficiaries would have benefited from the ruling that the executors had mismanaged the estate and were liable for surcharge. If so, it would mean that she herself would have received only a fraction of the total benefits conferred by her efforts. An asymmetry is created if, in the event she loses, she has to pay the total costs of the litigation. A rule to this effect might discourage individual beneficiaries from attempting to enforce claims of substantial although not certain legal merit against executors and administrators of estates.

But it would be premature to rule definitively that the executors may not obtain their attorneys' fees from Miss Hamilton in this case. We do not know enough about the circumstances in which her action was brought. For all we know the other beneficiaries of the Hamilton estate may have tried vigorously to prevent Miss Hamilton from bringing this suit, thinking she would lose. Or it may have been clear that the statute of limitations would prevent the other beneficiaries from obtaining any benefit from her suit, even if she prevailed. There is also a mechanical difficulty, if no more than that, in reimbursing the executors out of the assets of the estate. The estate has been closed out. It does not exist any more. It certainly is not a party to this lawsuit. Nor is the trust that succeeded it. Nor are any of the beneficiaries of the estate or the trust, other than Miss Hamilton herself. Maybe the choice in this case is not between a levy against the es-

tate and a levy against one beneficiary's share, but between a levy against one beneficiary's share and no reimbursement for the executors.

In short, the record does not provide us with an adequate basis for making an informed prediction as to how the Illinois courts would resolve this difficult question of first impression. We are not helped by the district court's discussion of the question because there was none—only a minute entry stating that the defendants were entitled to payment of their attorneys' fees out of the trust. (Both the plaintiff and the defendants treat this as intended to mean out of Miss Hamilton's share of the trust; we accept this gloss on the bare minute entry.) We therefore decided to remand the case to the district court to decide in the first instance whether Illinois courts would tax the attorneys' fees against Miss Hamilton's share of the trust in a case such as this. To determine just what kind of case this is, the district court may wish to explore such issues as whether the other beneficiaries of the Hamilton estate were consulted with regard to the bringing of this suit and whether they would in fact have benefited if Miss Hamilton had won. The fuller factual record that we suggest the district court compile will enable that court and if necessary this court in a subsequent appeal to decide a novel and difficult issue of state law in a more illuminating factual context than the present appeal offers.

The judgment on liability is affirmed; the judgment on attorneys' fees is vacated and remanded for further proceedings consistent with this opinion.

SO ORDERED.